C.A. No. 09-10139

D. Ct. No. CR 07-1207-TUC-RCC

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

HOWARD WESLEY COTTERMAN,

Defendant-Appellee.

_____

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF ARIZONA

_____

**APPELLEE'S ANSWERING BRIEF**
_____

WILLIAM J. KIRCHNER AND WALTER NASH
LAW OFFICE OF NASH & KIRCHNER, P.C.
P.O. Box 2310
Tucson, AZ  85702
Telephone:  (520) 792-1613
FAX:  (520) 628-1079
Attorney for Defendant Howard Wesley Cotterman

## <u>TABLE OF CONTENTS</u>

<u>**PAGE**</u>

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... v

ISSUE PRESENTED .................................................................. 1

STATEMENT OF THE FACTS ................................................... 1

SUMMARY OF ARGUMENT .................................................... 15

STANDARD OF REVIEW ......................................................... 17

ARGUMENT

    **It is constitutionally unreasonable for the Government to arbitrarily terminate a border search of personal property belonging to a couple returning from vacation, to seize and move their belongings far away from the border, and to keep and search the belongings for an indefinite period, all without reasonable suspicion that they contain any contraband, especially when the Government has the ability to search the same day at the border** .............................. 18

    I.    ***Preface*** ................................................................. 18
        A.    The Government's Statement of the Issue Is Misleading Because it Ignores Operative Facts. ............................ 18

        B.    Reasonable Suspicion and the Compact Disks Found at Lukeville Are No Longer Issues in this Appeal. ........... 20

    II.    ***The Courts below Correctly Applied the "Extended Border Search" Analytical Framework to this Case, Which Supports Suppression, as Does a General Analysis of Reasonableness*** ................................................. 22
        A.    This Search Did Not Occur at the Border. ................... 22

i

B.     This Case Involves a Seizure, Not Just a Search ......... 24

C.     The District Court's Distinction of Previous Cases Was
       Correct. ........................................................................ 25

D.     The Government's Agents Were Able to Conduct a
       Forensic Examination at the Border. ........................... 26

       1.     This Court should not be misled by the
              Government's misrepresentation of the record. .. 26

       2.     Preliminary forensics at the border would have
              revealed contraband in a matter of hours ........... 27

       3.     The technical and convenience concerns raised by
              the Government are not dispositive factors in this
              case ................................................................... 28

E.     The District Court Was Absolutely Correct in Applying the
       "Extended Border" Analysis ......................................... 30
       1.     "Functional Equivalent" cases can generally be
              categorized as "airplane/boat" cases, and
              "consigned shipment" cases. ............................. 30
              a.     Airplane and boat cases. ........................... 31
              b.     Shipments consigned to common carriers.
                     ................................................................ 33

       2.     The critical distinction between "functional
              equivalent" and "extended border" cases is that the
              latter occur **after** the first point in time when the
              entity might have been stopped within the country
              ............................................................................ 36

       3.     The court below correctly applied the "extended
              border" doctrine because it aligns with the principles
              of those cases ..................................................... 38

       4.     "Customs custody" or continuous control do not
              differentiate the two doctrines ............................. 40

5. The *Bennett* case strongly supports the District Court's conclusion that the instant case should be analyzed under the "extended border" doctrine ... 41

F. The Principles for Analyzing Reasonableness Show That this Seizure and Search Were Unconstitutional ........... 42

1. The scope of the intrusion was great ................... 43

2. The manner of the seizure was patently offensive ........................................................................... 44

3. The justification for the seizure was non-existent ........................................................................... 47

4. Summary ........................................................... 48

III. ***The Government's Opening Brief Contains Several Other Erroneous Arguments*** ........................................................ 49

A. The Government's Citations to Statutory Authority Are Not Dispositive Because They Do Not Apply under The Facts of this Case, and Because Statutes Are Subordinate to the Fourth Amendment .................................................. 49

B. The Government Misconstrues and Misapplies the Law Regarding Time, Distance and Delay Factors .............. 52

C. The Government Ignores the Well-Established Distinction between search and seizure ......................................... 54

D. This Case Does Not Present the Government's Imagined Scenarios ...................................................................... 56

1. Border officers can and do find pornography without a forensic lab ...................................................... 56

2. The agents can also ask the traveler to access files ........................................................................... 57

3. The mere possibility that files may exist in unallocated space does not justify a seizure ....... 59

4.    The Government's preferred solution - seizure of a traveler's property - remains readily available when there is a reasonable suspicion of criminal activity ............................................................................ 60

IV.   ***It Would Be Unreasonable to Extend the Border Exception this Far in Order to Justify a Search That Would Be Constitutionally Impermissible Away from the Border*** .... 61

CONCLUSION ........................................................................................... 63

STATEMENT OF RELATED CASES ........................................................ 65

CERTIFICATE OF COMPLIANCE ............................................................ 66

CERTIFICATE OF SERVICE .................................................................... 67

# TABLE OF AUTHORITIES

## CASES                                                      PAGE

Alexander v. United States,
        362 F.2d 379 (9th Cir. 1966) ....................................................... 30, 40

Almeida-Sanchez v. United States,
        413 U.S. 266 (1973) ...................................................... 30, 31, 51, 63

Camara v. Municipal Court,
        387 U.S. 523 (1967) ............................................................ 18, 42, 45

City of Indianapolis v. Edmond,
        531 U.S. 32 (2000) ......................................................................... 62

Dessar v. Bank of America,
        353 F.2d 468 (9th Cir.1965) ........................................................... 48

Gadda v. State Bar of Cal.,
        511 F.3d 933 (9th Cir. 2007) ......................................................... 21

Imperial Packaging Corp. v. U. S.
        535 F.Supp. 688 (CIT 1981) ........................................................... 49

Jones v. Wood,
        207 F.3d 557 (9th Cir. 2000) .......................................................... 21

Katz v. United States,
        389 U.S. 347 (1967) ....................................................................... 22

Kremen v. United States,
        353 U.S. 346 (1957) ....................................................................... 43

Marbury v. Madison,
        5 U.S. (1 Cranch) 137 (1803) ......................................................... 51

Officers for Justice v. Civil Service Com'n,
        979 F.2d 721 (9th Cir. 1992) .......................................................... 21

Sanchez v. County of San Diego,
        464 F.3d 916 (9th Cir. 2006) .......................................................... 42

Soldal v. Cook County, Ill,
        506 U.S. 56 (1992) ................................................................... 24, 25

Terry v. Ohio,
        392 U.S. 1, 18 (1968) ..................................................................... 43

United States v. $124,570 U.S. Currency,
        873 F.2d 1240 (9th Cir.1989) ......................................................... 61

United States v. Abbouchi,
        502 F.3d 850 (9th Cir. 2007) ............................................... 35, 36, 39

United States v. Alfonso,
        759 F.2d 728 (9th Cir. 1985) ......................................... 37-40, 47, 52

United States v. Alonso,
    48 F.3d 1536 (9th Cir. 1995) ........................................................... 21
United States v. Arnold,
    523 F.3d 941 (9th Cir. 2008) .................................... 25, 28, 29, 57, 61
United States v. Arvizu,
    534 U.S. 266 (2002) ........................................................................ 47
United States v. Bennett,
    363 F.3d 947 (9th Cir. 2004) ............................................... 32, 41, 42
United States v. Bulacan,
    156 F.3d 963 (9th Cir.1998) .......................................................... 61
United States v. Burnette,
    698 F.2d 1038 (9th Cir. 1983) ................................................... 54, 55
United States v. Caicedo-Guarnizo,
    723 F.2d 1420 (9th Cir. 1984) ................................................... 36, 37
United States v. Caminos,
    770 F.2d 361 (3d Cir. 1985) ...................................................... 33, 34
United States v. Cardenas,
    9 F.3d 1139 (5th Cir. 1993) ............................................................ 32
United States v. Cardona,
    769 F.2d 625 (9th Cir. 1985) .............................................. 35, 52, 55
United States v. Castillo-Garcia,
    424 F.2d 482 (1970) ....................................................................... 40
United States v. Delgadillo-Velasquez,
    856 F.2d 1292 (9th Cir.1988) ........................................................ 24
United States v. Duncan,
    693 F.2d 971 (9th Cir. 1982) ................................................... 31, 42
United States v. Espericueta-Reyes,
    631 F.2d 616 (9th Cir. 1980) ......................................................... 53
United States v. Flores-Montano,
    541 U.S. 149 (2004) ...................................................................... 23
United States v. Gallagher,
    557 F.2d 1041 (4th Cir. 1977 ................................................... 33, 34
United States v. Garcia,
    672 F.2d 1349 (11th Cir. 1982) .................................................... 32
United States v. Gaviria,
    805 F.2d 1108 (2d Cir. 1986) ....................................... 31, 33, 34, 36
United States v. Guzman-Padilla,
    573 F.3d 865 (9th Cir. 2009) ................................. 36-38, 40, 47, 53
United States v. Hill,
    459 F3d 966 (9th Cir. 2006) ............................................... 29, 43, 55

United States v. Ickes,
    393 F.3d 501 (4th Cir. 2005) ............................................... 25, 49, 57
United States v. Jacobsen,
    466 U.S. 109 (1984) ....................................................................... 24
United States v. Mattio,
    17 F.2d 879 (9th Cir. 1927) ........................................................... 50
United States v. Mejias,
    452 F.2d 1190 (9th Cir. 1971) ....................................................... 52
United States v. Mendoza-Ortiz,
    262 F.3d 882 (9th Cir.2001) .......................................................... 18
United States v. Montoya de Hernandez,
    473 US 531 (1985) ......................................................................... 19
United States v. Montoya,
    45 F.3d 1286 (9th Cir.1995) .......................................................... 21
United States v. Niver,
    689 F.2d 520 (5th Cir.1982) .......................................................... 36
United States v. Payton,
    573 F.3d 859 (9th Cir. 2009) ......................................................... 29
United States v. Potter,
    552 F.2d 901 (9th Cir. 1977) ......................................................... 32
United States v. Ramsey,
    431 U.S. 606 (1977) ...................................................................... 23
United States v. Roberts,
    1007 F.3d 990 (5th Cir. 2001) .................................................. 25, 57
United States v. Romm,
    455 F.3d 990 (9th Cir. 2006) ............................................. 25, 28, 57
United States v. Sahanaja,
    430 F.3d 1049 (9th Cir. 2005) ..................................... 30, 39, 40, 52
United States v. Seljan,
    547 F.3d 993 (9th Cir. 2008) (*en banc*) ........................................... 18
United States v. Sheikh,
    654 F.2d 1057 (5th Cir. 1981) ................................................. 33, 34
United States v. Whiting,
    781 F.2d 692 (9th Cir. 1986) ......................................................... 52
United States v. Yang,
    286 F.3d 940 (7th Cir. 2002) ......................................................... 52
United States v. Zermeno,
    66 F.3d 1058 (9th Cir. 1995) ........................................................... 6
Younger v. Harris,
    401 U.S. 37 (1971) ........................................................................ 51

## **STATUTES, RULES & CONSTITUTIONAL PROVISIONS**

19 C.F.R. § 148.31 ............................................................ 50

19 U.S.C. 1499(b)(1-3) .................................................... 51

19 U.S.C. § 1499(a)(2) .................................................... 50

19 U.S.C. § 1499(a)(2)(B) ......................................... 49, 50

19 U.S.C. § 482 .............................................................. 49

19 U.S.C. §1581 ............................................................. 49

19 U.S.C.A. § 1202 ......................................................... 49

Fed.R.App.P. 28(a)(9) .................................................... 21

U.S. Const. Art. VI cl.2 .................................................... 51

U.S.C. § 1499(a)(2)(B) ................................................... 49

## I.   ISSUE PRESENTED

If the Government wishes to search the papers and property of a

couple returning from a vacation in another country, and it has the ability to

do so at the border, is it nevertheless constitutionally reasonable for the

Government to arbitrarily terminate an ongoing border search, to then seize

and move the travelers' belongings far from the border, and to keep and

search them for an indefinite period, all without reasonable suspicion that

they contain any contraband?

## II.   STATEMENT OF THE FACTS

### A.   April 6, 2007- Friday Morning

#### 1.   Lukeville, Arizona Port of Entry - 9:57 a.m.:

Lukeville is one of the primary ports of entry through which tourists

return to the United States from Puerto Penasco, Mexico.   (RT 8/27/08 at

86; ER 139.)[1]   At 9:57 a.m. Defendant Howard Cotterman and his wife

Maureen arrived at the Lukeville Port of Entry ("POE") in their Ford

Explorer, returning from an extended trip to Mexico.   (Id. at 23-25, 37-38;

---

[1] The abbreviation "RT" is used herein for the term "Reporter's Transcript. "CR" refers to the Clerks' Record, with the subsequent number indicating the docket number of the item.  "ER" refers to the large volume of Appellant's Excerpt of Record (mistakenly entitled "Appellee's Supplemental Excerpt of Record") filed 8/31/09. "Supp. ER" refers to the smaller volume filed the same date.

ER 76-78, 90-91.)  The first officer to come in contact with them, Customs

Inspector Garman at the primary inspection lane, ran their passports

through the Treasury Enforcement Communications System ("TECS") and

found a "lookout" for Mr. Cotterman resulting from something called

"Operation Angel Watch, Angel Wings."  (Id. at 10-11, 86-87; ER 63-64.)  It

indicated that Mr. Cotterman's possessions, including any electronic media

such as computers, or cameras, should be searched for potential evidence

of child pornography.  (Id. at 48, 86-87; ER 101, 139-40.)  It apparently

gave no details about the substance of the issue that prompted the

"lookout."  (Id. at 11, 95; ER 64, 148.)  There was no lookout for Mrs.

Cotterman.  (Id. at 34; ER 34.)

Accordingly, Ofc. Garman referred the Cottermans' vehicle to the

secondary inspection area.  (Id. at 26; ER 79.)  Ofc. Kelly in secondary

asked Ofc. Alvarado, another secondary inspector, to inspect the media in

the Cottermans' vehicle, which consisted of two computers and three digital

cameras.  (Id. at 87; ER 140.)  Officers Garman and Kelly searched the

vehicle while Alvarado inspected the electronic devices.  (Id. at 29,45 101;

ER 82, 98, 154.)  Ofc. Alvarado had some experience searching

computers, having done so approximately 5 times before.  (Id. at 87-88,

104; ER 140-41, 157.)

Alvarado inspected the cameras and found nothing illicit.  (Id. at 30, 92; ER 83, 145.)  He examined the files on Mr. Cotterman's computer three times and found no contraband.  (Id. at 31, 39; ER 84, 92.)  He did locate one or more password-protected files on one of the computers.  (Id. at 91, 93; ER 144, 146.)  There is no indication in the record that he or anyone else ever asked the Cottermans for a password, or for help in opening any file at the border.  (Id. at 91, 93; ER 144, 146.)

2.     Long Beach, California  - mid-morning:

At some point the officers at Lukeville attempted to contact the person at the Pacific Field Intelligence Unit ("Pac FIU") in Long Beach, California who had entered the TECS lookout.  (Id. at 27, 94, 108, 126; ER 80, 147, 161, 179.)  Her partner eventually called back and advised Alvarado to look at any items that may have related to child pornography, including electronic media.  (Id. at 61, 94-95; ER 114, 147-48.)  This "lookout" was the result of a criminal conviction Mr. Cotterman had sustained approximately 15 years earlier, and the fact that he traveled abroad; nothing during the intervening years was given as a reason to stop Mr. Cotterman.  (Id. at 25-26, 49; ER 78-79, 102.)   Pac FIU directed Ofc. Alvarado to continue the Cottermans' detention and turn over what he found to other agents who would be coming to the port.  (Id. at 100-01; ER

3

153-54.)  Alvarado made no determination about what should happen to the computers.  (Id. at 94; ER 147.)

### 3. Arizona and California DHS/ICE Offices - noon hour:

Between 12:00 and 12:30 p.m. the officers at Lukeville got in contact with Agt. Mina Riley, the duty agent at the ICE office in Sells, Arizona.  (Id. at 7, 10; ER 60, 73.)  Her superior was ICE[2] Group Supervisor Craig Brisbine, whose 24 years of experience was in areas other than border inspection.  (Id. at 10, 106-07; ER 63, 159-60.)

Ofc. Alvarado briefed Agt. Riley telephonically.  (Id. at 10-11; ER 63-64.)  Riley was not sure what Operation Angel Watch, Angel Wings was, so she called the Pac FIU.  (Id. at 11-12; ER 64-65.)  Neither Agt. Riley nor Agt. Brisbine ever spoke to the person who had actually input the record.  (Id. at 12, 27; ER 65, 80.)  Agt. Riley did, however, speak with another person who informed her that the operation was "targeted" at registered sex offenders in California, specifically those who frequently travel outside the country.  (Id. at 12; ER 65.)  The Pac FIU requested Agt. Riley's "assistance with the seizure." (Exhibit 2; ER 234.)

---

[2]  The Government, in its Opening Brief, uses the general term "Customs" to refer to both the Customs and Border Patrol (CBP), and to Immigration and Customs Enforcement (ICE).  (See O.B. at 16, note 8.)  This conflation of two separate agencies is contradicted by the record.  (RT 8/27/08 at 114, 138; ER 167, 191.)

### B. <u>Noon Hour - Lukeville</u>:

Ofc. Alvarado had told Agt. Riley that they had located a couple of laptop computers and digital cameras, and that he had conducted an examination of files on those devices, including many photographs, which were all pictures of the Cottermans' vacation. (RT 8/27/08 at 12; ER 65.) He also told her there was a file that was password-protected. (Id. at 12-13, 91, 93; ER 65-66, 144, 146.). She also spoke with Ofc. Kelly, who informed her that they had searched every item that could contain child pornography, taking about two hours after the vehicle arrived at the port, and had found no evidence of child pornography. (Id. at 45-46; ER 98-99.) Riley told Alvarado to halt his search of the media and suspend all further action, that she and Agt. Brisbine would be on their way out to "take custody" of the property, and that he should await her arrival in about two hours. (Id. at 12, 29-31, 39-40, 46; ER 65, 82-84, 92-93, 99, 234, 237.)

Thus, at about noon, roughly two hours after the Cottermans had arrived at the border, the search of their possessions at the border came to a halt, and the Cottermans and the border agents simply waited for ICE to arrive. (Id. at 46; ER 99.) The Cottermans waited in an unlocked area of the lobby, and were not handcuffed. (Id. at 14; ER 67.) However, it was made very clear to them that they could not touch their property, which was left stacked around their vehicle, and that they were not to approach their

vehicle.  (Id. at 31; ER 84.)  Thus, the Cottermans were not free to go, as

they had no realistic way to leave.  (Id. at 31, 33, 139-40; ER 84, 86, 192-

93.)

Before departing from Sells, Agt. Riley ran a criminal history on

Howard Cotterman, revealing only that he had a prior conviction from 1992

pertaining to child pornography, for which he was required to register as a

sex offender.[3]  (Id. at 49, 53-54, 111; ER 102, 106-07.)  About an hour after

these calls Agts. Riley and Brisbine left Sells for Lukeville, arriving at

approximately 3:30 in the afternoon.  (Id. at 13, 109; ER 66, 162.)  They

---

[3]  The Government's Opening Brief improperly lists convictions for several
specific offenses that unspecified "record checks" supposedly confirmed
"[w]hile at secondary inspection." (O.B. at 5-6.)  In fact, however, the only
agent at the evidentiary hearing who was also at the border when the
Cottermans arrived testified only that a person he spoke with in Long
Beach told him that Mr. Cotterman could be "involved in some type of child
pornography." (RT 8/27/08 at 95; ER 148.)  There is no evidence
whatsoever in the record matching the specific contentions in the Opening
Brief. (See Id. at 25, 48-49, 53-54, 61, 111; ER 78, 101-02, 106-07, 122,
164.) The Government's only citations for this "fact" are to an allegation
and a brief the Government itself filed in the court below.  It is respectfully
submitted that the Government's own pleadings are not evidence, and
therefore cannot properly be cited for factual assertions.  See e.g. United
States v. Zermeno, 66 F.3d 1058, 1062 (9th Cir. 1995) (Government's
assertions in its pleadings are not evidence).  The Government has the
burden of proof in this case, and if a fact was important to its case it had a
duty to present evidence of that fact at the evidentiary hearing, not just
make assertions based upon its own pleadings.  This Court should ignore
all of the "facts" in the Opening Brief that the Government cites only to its
own pleadings. See O.B. at 5-12, citing its Response to Defendant's Motion
to Suppress approximately 20 times.

planned to administer <u>Miranda</u> warnings to the Cottermans and see if they would be willing to answer questions, and then to seize all of their computer equipment and take it to Tucson.  (<u>Id</u>. at 40, 109, 115; ER 93, 162.)  At the time they made that decision no law enforcement officer had encountered any indication of contraband on either computer.[4]  (<u>Id</u>. at 113-14; ER 166-67.)

Agts. Riley and Brisbine had already determined, even before leaving their office that "one way or the other" the Cottermans' computers were going to be taken away from them and brought to Tucson as part of Immigration and Customs Enforcement ("ICE") policy, even though a violation was not "immediately evident," as required by that policy.[5]  They did not even attempt to take with them Agt. Owen, their expert who was standing by and had the forensic tools and skills to examine the laptops and cameras properly at the border.  (<u>Id</u>. at 46, 59-60, 73, 127; ER 99, 112-13, 126, 180.)

---

[4]  Two of the Government's own agents explicitly testified that there is nothing suspicious about having password-protected files on a laptop computer.  (RT 8/27/08 at 81, 93; ER 134, 146.)

[5]  Although no violations of law were "immediately evident, the policy quoted by Agent Brisbine may have condoned "further review by ICE" anyway.  (<u>Id</u>. at 115, 119-20; ER at 168, 172-73.)

### C.    **Afternoon - ICE Agents arrive at Lukeville**:

When Agts. Riley and Brisbine arrived at the port it was obvious that the contents of the Cottermans' vehicle had been thoroughly searched. (Id. at 28; ER 81.) Books, papers and personal effects were still spread out on a bench and on the ground around the vehicle. (Id. at 28, 138-39; ER 81, 191-92.) The doors of the vehicle may have been left open, causing the vehicle's battery to discharge, although this is unclear from the testimony. (Id. at 29, 38, 139; ER 82, 91, 192.) Agt. Riley was later given copies of some handwritten notes, records and personal documentation belonging to the Cottermans, none of which had any connection to child pornography. (Id. at 28-29; ER 81-82.) Those personal records presumably remain with Agt. Riley to this day. (Id. at 29; ER 82.)

Upon Brisbine and Riley's arrival at the port Ofc. Alvarado briefed Riley about what was found on the computers and cameras -- photos of family vacations and the like, along with the password-protected file, but nothing illegal. (Id. at 30, 93; ER 83, 146.) She also knew that Officers Kelly and Garman had, during their search of the Cottermans' other belongings, turned up no indications that child pornography was present. (Id. at 34; ER 87.)

### D.    **Evening - Interrogations:**

After some preparation, Agts. Riley and Brisbine began the interrogations.  They first spoke with Mrs. Cotterman, who had no convictions of any kind, and was not on any kind of watch.  (Id. at 15, 34, 111; ER 68, 87, 164.)  Mrs. Cotterman's interview began between 4:00 p.m. and 4:45 p.m.  (Id. at 34, 37; ER 87, 90.)  The agents began by reading her Miranda rights.  (Id. at 35; ER 88.)  Nevertheless, they told her she was not under arrest or being accused of any crime, and this was just an interview regarding their travels in Mexico.  (Id. at 36; ER 89.)   She was upset about the time that it had taken for Riley and Brisbine to get there, and she stated that she wanted to leave.  (Id. at 35-37; ER 88-90.)

The agents then spoke to Mr. Cotterman after Agt. Riley read him his Miranda rights.  (Id. at 37; ER 90.)  They asked him about his travels in Mexico.  Nothing he said was inconsistent with what Mrs. Cotterman had already told Agt. Riley.  (Id. at 37-38; ER 90-91.)  They both recounted their trip, including going whale watching, which Agt. Riley verified from pictures among their possessions.  (Id. at 38; ER 91.)

When the agents interrogated Mr. Cotterman he offered to help them with further access to his computer.  (Id. at 38-39; ER 91-92.)  However, Agt. Riley declined to review the computer, supposedly for fear that files could be booby-trapped, and also because there might be files they could

not see with the "naked eye." (Id. at 39; ER 92.)   She subsequently

testified that the seizure of the computers was predetermined and Agt.

Owen was awaiting them.  (Id. at 40, 52, 127; ER 92-93, 105, 180.)


### E.      Seizure and Removal of Cottermans' belongings:

By 6 p.m. the Cottermans had been detained some eight hours,

without any evidence of a crime or wrongdoing of any kind being found.

Nevertheless, Agts. Riley and Brisbine seized the laptop computers and a

camera for further forensic analysis in Tucson.  (Id. at 15-16; ER 68-69.)  In

addition they seized the carrying cases the computers were stored in,

which contained personal items clearly unrelated to pornography, such as

business cards and a change purse.  (Id. at 75-76; ER 128-29.)  The

inspectors also found personal papers, possibly financial records or

time-share information, which they photocopied and have retained.  (Id. at

29; ER 82.)

They returned a video camera and a digital camera to the

Cottermans, although no witness at the hearing could state why these were

returned at the border, but not the Pentax camera, which had also been

inspected.  (Id. at 16, 69; ER 69, 122.)   When Agt. Brisbine left Lukeville at

about 6:30 p.m. the Cottermans were still there loading the remainder of

their belongings into their vehicle in the secondary inspection area, more than 8½ hours after their arrival.  (Id. at 18, 38, 120-21; ER 173-74.)

Agt. Brisbine took the personal belongings to Tucson that night.  (Id. at 17, 75-76; ER 70, 128-29.)  He turned them over to ICE Agent John Owen at about 11 o'clock that night.  (Id. at 17-18, 61, 120; ER 70-71, 114, 173.)

### F.    April 7 and 8, 2007 - Forensic Examination:

Agt. Owen started inspecting both of the laptops on Saturday morning at around 11 a.m.  (Id. at 65-66, 73; ER 118-19.)  He examined the Pentax camera and found nothing illegal on it.  (Id. at 62; ER 115.)  He next examined the copy he had made of Maureen Cotterman's computer, which took him "several hours."  (Id. at 62-63; ER 115-16.)  He found numerous personal records, but no contraband. (Id. at 18, 63, 111-13; ER 71, 116, 164-66.)  He nevertheless retained the copy of Mrs. Cotterman's hard drive in his lab.  (Id. at 63; ER 116.)

On  the afternoon of the following day Agt. Owen examined Mr. Cotterman's computer and discovered some images of child pornography in unallocated clusters on the computer's free space.  (Id. at 18, 53, 78, 121-22, 128-29; ER 71, 106, 131, 174-75.)   Testimony indicated that it is possible for images to exist on a computer drive even if they were deleted

11

or were never intentionally saved. (Id. at 123-24; ER 176-77.). The analysis completed that afternoon took "several hours," and did not include the password-protected files. (Id. at 78; ER 131.) At that point, Agt. Brisbine believed that they may still not have had enough evidence to arrest and charge Mr. Cotterman. (Id. at 137-38; ER 190-91.) Nevertheless, they did not bother to apply for a warrant to search further, based on what they had already found.

### G. April 11, 2007 - Password Protected Files Opened:

On the following Wednesday Agt. Owen was able to access the password-protected files, which were found to contain child pornography. (Id. at 78, 134; ER 131, 165.) By that time the Cottermans' belongings had been in the Government's custody for over five days, and were approximately 180 miles from Lukeville. (Id. at 78, 109; ER 131, 162.)

During the days after the Cottermans left Lukeville, ICE personnel contacted them repeatedly, requesting that they come to the office to retrieve various belongings. On Saturday, the Cottermans went in to retrieve their digital camera. (Id. at 19, 121; ER 72, 174.) On Sunday Agt. Owen called to tell them that they could pick up Mrs. Cotterman's computer on Monday, and he also asked for Mr. Cotterman's assistance with opening some password-protected files. (Id. at 19-20; ER 72-73.) Mrs. Cotterman

returned on Monday April 9 to pick up her computer, after Agt. Owen

determined there was no contraband on it, but Mr. Cotterman did not come

with her.  (Id. at 47, 65, 121; ER 100, 118, 174.)  On April 10 Agt. Riley

learned that Mr. Cotterman had boarded a plane for Mexico on the 9th, and

later traveled to Sydney Australia.  (Id. at 21-22, 136; ER 74-75, 189.)

### I.  **July, 2007; Subsequent Events**:

Approximately two months after these events an unspecified person

found a case containing some CDs at the Lukeville Port.  (Id. at 17, 42; ER

70, 95.)  No witness who personally knew the circumstances of the

discovery testified at the hearing.  (Id. at 42; ER 95.)  Testimony at the

hearing indicated that no appropriate chain of custody for the disks could

be established.  (Id. at 17, 42-43; ER 70, 95-96.)  The disks were sent to

Agt. Riley, and she forwarded them to Agt. Owen for forensic review.[6]  (RT

8/27/08 at  at 17; ER 70.)

---

[6]  The Opening Brief claims that these disks were discovered at the
Lukeville POE "shortly after the Cottermans' departure on April 6, 2007."
(O.B. at 9.)  The Government favors this Court with no record citation for
this assertion. Its own witness testified that it was found "a couple months"
months later.  (RT 8/27/08 at 17, 42; ER 70, 95.) The Magistrate Judge
concluded that Government agents had probably mishandled the CDs at
the border.  (CR 58 at 13; Supp. ER at 15.)  Because the Government does
not raise the order suppressing the disks as an issue in its brief, they are
not discussed further herein.

Mr. Cotterman was arrested in March of 2008.[7]  (CR 13.)  Defense

counsel subsequently moved to suppress all of the Government's evidence

on the grounds that it was the fruit of an unlawful seizure.  (CR 17; ER 252-

63.)  The Government filed a response opposing suppression and the

defense replied.  (CR 36; ER Vol. III, filed 9/15/09.) The defense filed

affidavits indicating that the Cottermans did not leave any of their

belongings behind at the Lukeville POE voluntarily, and that they expected

that the files on their computers would remain private.  (CR 40; RT 8/27/08

at 54-56, 140; ER 107-09, 193.)  The Court ultimately accepted those

assertions to find that Mr. Cotterman had standing to challenge the search

and seizure herein. (RT 8/27/08 at 140; ER 193.)

After the Court set an evidentiary hearing on the matter the defense

issued subpoenas for Agts. Garman, Kelly, Alvarado, Owen, Riley and

Brisbine to testify at the hearing.  (CR 19, 41; ER 72, 94.)  The Government

refused to accept service for the agents and moved to quash all of the

subpoenas.  (CR 41 and attached documents.)  The defense filed a

---

[7]  This brief does not address Mr. Cotterman's travels and the search of his
home in California, which are set forth in great detail in the Government's
Opening Brief.  (O.B. at 8-11), Although that discussion contains
speculation presented as fact, there is no need to rebut those inaccuracies
because they are irrelevant to the legal issues that govern the appellate
level of this case.  In addition, they are cited only to the Government's own
pleading, which is inappropriate as discussed above

response, and after a hearing the Court quashed the subpoenas for Agts. Garman and Kelly, but left the remaining subpoenas in force.  (CR 43, 44.)

Magistrate Judge Charles Pyle conducted the evidentiary hearing on August 27, 2008 and took the matter under advisement.  (CR 46.)  In his subsequent Report and Recommendation (hereinafter "R&R"), he concluded that suppression should be granted.  (CR 58; Supp. ER at 3-16.)  The Government filed its objections, the defense filed a response, and the Government replied.  (CR 60, 62, 64; ER 19-26, 27-53.)  The District Court, after *de novo* review, adopted the Magistrate Judge's recommendation and granted the motion to suppress.  (CR 71; Supp. ER at 1-2.) The Government filed a timely notice of interlocutory appeal. (CR 72; ER 17.)

## III.   **SUMMARY OF ARGUMENT**

This case involves a search, followed by a seizure, followed by a second search, and the issue here is whether the seizure and second search were lawful.  The operative question in any Fourth Amendment case is whether a search or seizure is "reasonable."  Our courts have developed several theoretical frameworks for analyzing that issue when an international border is involved.

The first involves searches conducted at the border itself.  Those are permissible even where the agents have no particularized suspicion of

wrongdoing. Although the second search in the present case did not occur at the border, the Government claims that the "border" somehow moved with the agents who had seized these belongings and traveled with them almost two hundred miles away. In fact, however, no case has been presented to this Court, or to the courts below, and none is known to counsel, indicating that the border somehow envelops and follows a Government agent who has seized possessions from a traveler before encountering any indicator of wrongdoing.

The Government suggests, in the alternative, that the "functional equivalent of the border" doctrine, which does not require reasonable suspicion of wrongdoing, is applicable here. It is not. That analytical framework is designed for situations such as airplane or ocean travel, and for items consigned to common carriers, in which a search is not practicable or necessary where the item actually crosses the border, and therefore may be conducted when the item first comes to rest within the United States, or at the final destination for common-carrier shipments. In the instant case, the seizure and subsequent search involved none of those categories, did not take place where travelers functionally enter the country, and occurred long after this property first came to rest in this country.

16

A third analytical framework, which the District Court correctly employed here, is the "extended border" doctrine. That doctrine is designed to cover situations in which a search is conducted after and away from the point at which a traveler's conveyance first comes to rest in this country. It applies, however, only if the Government had a reasonable suspicion of wrongdoing before the search. This case fits well within the analytical framework of that doctrine, but fails that test because the Government did not possess reasonable suspicion of wrongdoing, a point that the Government has now conceded in its Opening Brief.

Furthermore, under the particular circumstances of this case, the seizure and search were not reasonable because they were too broad in scope, they were conducted in an arbitrary and offensive manner, and because the Government's actions were not based on sufficient justification. In addition, the policy reasons that the Government poses for allowing such searches are based on imagined facts, and are vastly overstated. Accordingly, the District Court was correct in holding that the search was unlawful, and that the evidence must be suppressed.

## IV. **STANDARD OF REVIEW**.

The Government's Opening Brief correctly states one part of the standard of review. A district court's ruling on the legality of a border

17

search is reviewed *de novo*. <u>United States v. Seljan</u>, 547 F.3d 993, 999

(9th Cir. 2008) (*en banc)*. The Government ignores the other pertinent

portion, however, which is that a district court's findings of fact are

reviewed for clear error. <u>Id</u>. <u>See</u> <u>also</u> <u>United States v. Mendoza-Ortiz</u>, 262

F.3d 882, 885 (9th Cir.2001).


## <u>ARGUMENT</u>

**It is constitutionally unreasonable for the Government to arbitrarily terminate a border search of personal property belonging to a couple returning from vacation, to seize and move their belongings far away from the border, and to keep and search the belongings for an indefinite period, all without reasonable suspicion that they contain any contraband, especially when the Government has the ability to search the same day at the border.**


**I.** **_Preface_**

    A. <u>The Government's Statement of the Issue Is Misleading Because it Ignores Operative Facts</u>.

It must be noted at the outset that the Government's Opening Brief

mischaracterizes the issue. The ultimate test for whether any search or

seizure can pass Fourth Amendment muster is whether that search or

seizure was reasonable. <u>Camara v. Municipal Court</u>, 387 U.S. 523, 539

(1967). Constitutional reasonableness depends on all of the facts and

circumstances of a case. <u>United States v. Montoya de Hernandez</u>, 473 US 531, 537 (1985). The Government's phrasing of the issue, however, studiously ignores the individual facts of this case that made the seizure of the Cottermans' belongings unreasonable, and make this case *sui generis*.

This is not an abstract case about computers. It is a case with specific facts about the presumptive -- indeed presumptuous -- seizure of personal possessions, even though the Government's stated goal (to search a computer) could have been accomplished without such a seizure. The Government's phrasing of the issue ignores the undisputed testimony that CBP agents do not ordinarily seize items at the border when there is no indication that the item is, or contains, contraband. The Government's phrasing also ignores the overwhelming evidence that the Customs officers at the border could have accessed enough of the files on Mr. Cottermans' computer at the border itself to decide whether or not to go forward.

The real issue is whether it was constitutionally reasonable for the agents to seize the Cottermans' personal belongings, take them physically from their presence, move them far away from the border, hold them for an indefinite period of time, and copy and inspect computer files and personal papers, all without reasonable suspicion that they contained any contraband, when a search at the border could have accomplished their purpose. The applicable law shows that these actions were unreasonable.

19

B.    Reasonable Suspicion and the Compact Disks Found at
      Lukeville Are No Longer Issues in this Appeal.

It is also important to note that there is no longer an issue in this case as to whether the agents did or did not have reasonable suspicion of wrongdoing before the seizure and search of the Cottermans' belongings. The Government has now abandoned that issue.

The Magistrate Judge determined, after very deliberate and thorough consideration, that there was "no evidence to support a determination of reasonable suspicion."  (CR 58 at 8-11; ER 10-13.)  Thereafter the Government, in its Objection, argued to the District Court that the agents did have reasonable suspicion.  (CR 60 at 20-24; ER 46-50.)  The District Court nevertheless adopted the R&R in whole, thereby rejecting the Government's contention.  (CR 71; ER Supp. ER 8/31/09 at 1-2.)

Now, in its Opening Brief, the Government has discarded its previous argument that there was reasonable suspicion.  Its own phrasing of the issue presented incorporates its concession that the computer was searched "without reasonable suspicion."  (OB at 2.)  The Government presents no claim or argument whatsoever that reasonable suspicion existed here.  Thus, it has abandoned its previous contention.  Because the Government has not argued in its Opening Brief that the search was supported by reasonable suspicion, that contention is now waived.  See

20

United States v. Alonso, 48 F.3d 1536, 1544 (9th Cir. 1995); Jones v. Wood, 207 F.3d 557, 562, n.2 (9th Cir. 2000); Officers for Justice v. Civil Service Com'n, 979 F.2d 721, 726 (9th Cir. 1992). See also Fed.R.App.P. 28(a)(9) (providing that an appellant's Opening Brief "must contain the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies.")

Accordingly, the Government may not now contend in its reply brief that it had reasonable suspicion. It is well established that issues may not be raised for the first time in a reply brief. Gadda v. State Bar of Cal., 511 F.3d 933, 937 (9th Cir. 2007) citing United States v. Montoya, 45 F.3d 1286, 1300 (9th Cir.1995). The Government has abandoned that contention and consequently Appellee does not address reasonable suspicion further in this brief.

Similarly, the disks found at Lukeville months after the Cottermans crossed the border are no longer an issue. The District Court ordered their suppression. (CR 58 at 11-14; Supp. ER at 13-15.) The Government has neither challenged that portion of the order in its Opening Brief, nor presented any argument that it was incorrect. (O.B. at 9-10; 13, n.7.) It has thereby abandoned that issue as well, and consequently it is not addressed further herein.

**II.** ***The Courts below Correctly Applied the "Extended Border Search" Analytical Framework to this Case, Which Supports Suppression, as Does a General Analysis of Reasonableness***.

It is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). One such exception is the "Border Search." As discussed below, that exception covers searches at the physical border and has also been expanded to cover searches well inside the border under the "functional equivalent" and "extended border" doctrines.

A.    This Search Did Not Occur at the Border.

The primary facet of the "Border Search Exception" concerns routine Customs searches conducted at the physical border. The Government properly notes that such searches require neither probable cause nor reasonable suspicion to conduct. (O.B. at 15.) What it downplays, however, is that all of the jurisprudence in this area is premised on the fundamental precondition that the search is conducted ***at our country's borders***, or the functional equivalent thereof. As the Supreme Court has recognized, "[S]earches made ***at the border*** . . . are reasonable ***simply by***

22

***virtue of the fact that they occur at the border***."  United States v.

Flores-Montano, 541 U.S. 149, 152-153 (2004) citing United States v.

Ramsey, 431 U.S. 606, 616 (1977) (emphasis added).  Despite the

Government's continual references to suspicionless searches at the border

or its functional equivalent as "border searches," (e.g. O.B. at 20-24), the

second search at issue in this case took place at neither the physical

border, nor its functional equivalent.

The gist of the Government's argument seems to be that it should not

matter whether the items are searched at the border or away from it, so

long as the Government had the authority to initiate a search.  In other

words, the Government would have this Court hold that its agents may

seize travelers' property at the border on a whim, or a hunch, or for no

reason at all and take it anywhere they want, with the border somehow

enveloping it, cocoon-like, wherever it goes, and for an untold time. (O.B. at

21-22.)  This would effectively create a third border search doctrine

rendering the others pointless and crippling the Fourth Amendment by

turning the entire United States into "the border."  No case law has been

cited, nor is any known to counsel undersigned, supporting that

proposition.

B.    This Case Involves a Seizure, Not Just a Search.

The Government's argument is also faulty because it ignores the different expectations a reasonable person would have regarding a ***search*** and a ***seizure***.  The Government bears the burden of showing that a warrantless seizure does not violate the Fourth Amendment.  United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1295 (9th Cir.1988).  That burden is unmet here.  A search at the physical border is *per se* reasonable because it occurs at a place where a traveler has no expectations of privacy.  In contrast, travelers reaching a border crossing obviously have a reasonable expectation that their belongings will not be physically taken many miles away from them and held for an indefinite period without at least a reasonable suspicion of wrongdoing.  Thus, a suspicionless ***search*** is reasonable; a suspicionless ***seizure*** is not.

The Government also claims periodically that the Cottermans' belongings were not "seized," but were merely "detained."  (O.B. at 3, 21, 29, 31, 37.) Perhaps that is a distinction that ICE draws, but it is not the test applicable for Fourth Amendment analysis.  For Fourth Amendment purposes, a "seizure" of property occurs where there is some meaningful interference with an individual's possessory interests in that property." Soldal v. Cook County, Ill, 506 U.S. 56, 61 (1992) citing United States v. Jacobsen, 466 U.S. 109, 113 (1984).  Physically taking from the

Cottermans the kind of belongings that Americans use in everyday life and forcing them to leave without them was most surely a meaningful interference with their possessory interests, and therefore was a "seizure" for purposes of this discussion, regardless of how ICE would have classified these actions.  Indeed, elsewhere in its own brief the Government refers to the Cottermans' computers as having been "seized." (O.B. at 4.)  It is sophistry to claim they were not.  Moreover, it is well established that a "seizure" may violate the Fourth Amendment even if the owners' "privacy" was not invaded.  Soldal, 506 U.S. 56 at 69.  The issues of search and seizure are not identical.


     C.     The District Court's Distinction of Previous Cases Was Correct.

     The Government also argues that "nothing in Arnold [or Ickes, Romm and Roberts] states that a search like the one at bar would not constitute a border search."  (O.B. at 28-30, citing United States v. Arnold, 523 F.3d 941 (9th Cir. 2008), United States v. Ickes, 393 F.3d 501 (4th Cir. 2005), United States v. Romm, 455 F.3d 990 (9th Cir. 2006) and United States v. Roberts, 1007 F.3d 990 (5th Cir. 2001).  In fact, however, neither the Magistrate Judge nor the District Court ever said any of those cases was directly on point.  Instead, the Courts' analysis of those cases boiled down to the observation that they are distinguishable -- they are not authority for

finding this seizure to be lawful because in those cases the contraband was discovered at the border, whereas here the agents took the Cottermans' belongings far from the border and searched it for days. (CR 58 at 4-6; Supp. ER at 6-8.) That analysis is absolutely correct.

    D.    <u>The Government's Agents Were Able to Conduct a Forensic Examination at the Border</u>.

        1.    <u>This Court should not be misled by the Government's misrepresentation of the record.</u>

The Government takes issue with the Magistrate Judge's statement that "[t]he search could have been done... at the border because the technician could have traveled down from Tucson with his laptop computer to do the analysis." (OB at 23.) This is a factual finding reviewable only for clear error, as set forth above.

This finding was not error at all, much less clear error, because it is fully supported by the record. The Government claims in its Opening Brief that Agt. Owen testified "that any search at the border would not have yielded the same results." (O.B. at 23.) It also claims that he testified that he "had specialized computer forensic equipment and software at his Tucson lab," and "such software is necessary to search unallocated space on a laptop computer." (OB at 24.) Both assertions are patently false. The Government gives no record citation for the first of the two statements, but

for the second it cites to pages 71-73 and 79-80 of the suppression hearing transcript. No such testimony is contained on those pages, or anywhere else that undersigned counsel can find.

On the contrary, Agt. Owen explicitly testified that he did indeed have forensic software on his laptop, that he could have brought it to the border with him, and that it was capable of accessing the unallocated space on Mr. Cotterman's computer. (RT 8/27/08 at 79-80; ER 132-33.) When he did such a search at his office it took only "several hours" to search the unallocated space of each of these two laptop computers. (Id. at 63, 78; ER 116, 131.) Agt. Owen conceded that, although it may have been more time-consuming and less convenient, he could have conducted a forensic examination at the border. (Id. at 80; ER 133.) The Government misrepresents the record.

> 2. <u>Preliminary forensics at the border would have revealed contraband in a matter of hours.</u>

In addition, this Court should not lose sight of what could have been done to develop reasonable suspicion in this case. The relevant time of the search at the border is not, as the Government implies, the time necessary to justify an ***arrest*** but rather the time to justify the ***seizure***. If Ofc. Alvarado had requested a password from Mr. Cotterman, or the ICE

agents had accepted Mr. Cotterman's offer to provide them access, reasonable suspicion for a seizure could have been developed quickly at the border. (RT 38-39; ER 91-92.) While it is not clear from the record whether the contraband would have been revealed, there would likely have been reasonable suspicion in either situation (contraband discovered or refusal to supply all necessary passwords).

Moreover, Agt. Owen testified that his search of the unallocated space on each of the computers required just "several hours." (RT 63, 78; ER 116, 131.) A search of the unallocated space on Mr. Cotterman's computer at the border could have revealed photographs that would have provided reasonable suspicion to go forward, or even probable cause for a warrant. See Arnold, and Romm. Thus, it was not necessary to complete the time-consuming job of breaking passwords before seizing Mr. Cotterman's computer.

3. The technical and convenience concerns raised by the Government are not dispositive factors in this case.

The Government attempts to justify moving the search away from the border for technical reasons and by claiming that searching computers at the border would take too long. (O.B. at 21-24, 44.) But condoning the seizure of property without suspicion of wrongdoing just because

28

computers are involved would be to create a form of technology exception, something this Court has already soundly rejected.  See Arnold, 533 F.3d at 1009; United States v. Payton, 573 F.3d 859, 864 (9th Cir. 2009) (rejecting a "technology-specific" argument by the defense).  Moreover, as established above, a sufficient search herein could have been conducted at the border.

The Government also notes several potential risks of performing an on-site search, citing United States v. Hill, 459 F3d 966 (9th Cir. 2006). (OB at 23-24.)  What this Court rejected in Hill however, was the proposition that police searching a suspect's home must bring their own forensic equipment to that home.  That is quite different than the instant case, in which the Government could have brought a laptop with forensic software to its ***own facility*** in Lukeville, a much more controlled and predictable environment than a suspect's home. Agt. Owen mentionned only one of the concerns discussed in Hill -- equipment failure -- and then only as a convenience factor.  (RT 80; ER 133.)  The other concerns (media variety, power failure, human error, and a personal residence ) are either irrelevant or inapplicable here.

E. The District Court Was Absolutely Correct in Applying the "Extended Border" Analysis.

For searches that take place away from the physical border, but that involve a border crossing, courts have developed two other frameworks for analysis. The first was the "extended border" concept, which this Court began to develop in Alexander v. United States, 362 F.2d 379 (9th Cir. 1966). See United States v. Sahanaja, 430 F.3d 1049, 1053 (9th Cir. 2005) (recognizing that this concept was first articulated in Alexander.) The second was the "functional equivalent of the border" concept established in Almeida-Sanchez v. United States, 413 U.S. 266 (1973). The District Court in the present case ruled that the principles associated with the "extended border" doctrine, rather than the "functional equivalent" doctrine should be applied herein. As demonstrated by the discussion below, it was entirely correct in doing so.

1. "Functional Equivalent" cases can generally be categorized as "airplane/boat" cases, and "consigned shipment" cases.

The Government wants this Court to hold that the "functional equivalent" doctrine applied to this case because that doctrine does not require reasonable suspicion. (O.B. at 31-33.) The principal rationale for the "functional equivalent" doctrine is that in certain situations (generally

involving airplanes, boats and shipments consigned to common carriers) it is impractical or unnecessary to expect that Customs will search travelers or shipped items at the exact moment they cross the international border. Instead, the search can be done where they functionally enter the country.

a.　Airplane and boat cases.

The most common application of the "functional equivalent" doctrine occurs in air travel, because airplanes cannot be expected to stop in mid-air where they cross the border.  Instead, the first practicable opportunity for a Customs inspection is when the airplane lands, or in the case of a departing flight, before it takes off.  In addition, Customs inspections at airports are conducted with a high degree of regularity at designated checkpoints and there is little discretionary enforcement activity at them, all of which are analogous to Customs inspections at the physical border. United States v. Gaviria, 805 F.2d 1108, 1112 (2d Cir. 1986).  Accordingly, our courts have long recognized international arrival and departure airports as the "functional equivalent" of a border.  See United States v. Duncan, 693 F.2d 971, 977 (9th Cir. 1982) citing Almeida-Sanchez, 413 U.S. at 273.

Cases involving maritime travel are analogous to airplane cases, in that it is often impractical for Customs to search a boat precisely when it enters U.S. territorial waters.  In such cases, the courts have held the

31

functional equivalent of the border to be any point within our waters, or the first point at which the boat docks. United States v. Bennett, 363 F.3d 947, 949-50 (9th Cir. 2004); United States v. Garcia, 672 F.2d 1349, 1364 (11th Cir. 1982).

The principles relevant to the present case that may be drawn from these airplane and boat examples are that the "functional equivalent" doctrine applies when:

● there is a "practical impossibility of requiring the subject searched to stop at the physical border." United States v. Cardenas, 9 F.3d 1139, 1148 (5th Cir. 1993);

● the search occurs at the "first practicable opportunity;" United States v. Potter, 552 F.2d 901, 907 (9th Cir. 1977); and

● the search occurs "at the first place where [the conveyance] comes to rest within the country." Garcia, 672 F.2d at 1365.

None of those circumstances existed here. There was no practical impossibility of stopping at the border -- indeed the Cottermans did stop, of their own volition, at an official checkpoint and were searched there. The search at issue here occurred far in time and distance after the Cottermans first came to rest in the United States. Accordingly, the principles of the boat and airplane aspects of the functional equivalent doctrine are not applicable to this case.

b.    Shipments consigned to common carriers.

A  second category of "functional equivalent" cases involves items

consigned for shipment to a third party, such as a common carrier.  Such

cases generally adhere to the principles noted above, along with

"safeguards to protect importers from unreasonable searches" that allow

the search to be conducted "at the intended destination of the goods."

Gaviria, 805 F.2d at 1114.  So long as the goods are certain to have

remained unchanged, the final destination is considered to be the

"functional equivalent."

The Government cites four cases that involved consigned shipments

searched after they first arrived in the U.S. to support its argument that the

search in the present case was justified under the "functional equivalent"

doctrine.  Those cases are Gaviria, United States v. Caminos, 770 F.2d

361 (3d Cir. 1985), United States v. Sheikh, 654 F.2d 1057 (5th Cir. 1981),

and United States v. Gallagher, 557 F.2d 1041 (4th Cir. 1977).  (See O.B.

at 19-20, 31-33.)

Those cases are not on point, however, because they do not involve

a seizure, as does the instant case.  In each of those cases the contested

inspection was of an item voluntarily entrusted by its owner to a common

carrier for shipment from abroad into the United States.  In each case the

shipment first arrived at a port of entry, was forwarded on toward its final

destination, and was subsequently inspected at the POE closest to its ultimate destination.  Gaviria, 805 F.2d at 1110; Caminos, 770 F.2d at 362-63; Sheikh, 654 F.2d at 1060; Gallagher, 557 F.2d at 1042, 1044.  In each of those cases the Courts held that the inspections took place at the "functional equivalent" of the border.

None of those cases involved American citizens presenting themselves at a POE with their belongings as does the instant case. Moreover, the rationale the courts used in deciding all of these cases depended on that fact -- that the items were voluntarily consigned to a carrier rather than arriving in the owner's possession.  In contrast, a traveler has done nothing of the sort by appearing at a POE with his household possessions. Travelers expect to regain possession of their property upon entry and to continue on their way in possession of their goods unless something illegal is found, or at least reasonably suspected.

Furthermore, when one ships anything internationally, one knows that there may be an inspection somewhere, but the exact point at which it occurs is immaterial to the owner because no matter where it occurs the package is already in the possession of a common carrier, and the owner has no reasonable expectation of re-taking possession of the package before its delivery.  See e.g. Caminos, 770 F.2d at 365 (explaining that

there is "no reason not to allow border searches to be conducted at the destination point, rather than at the point of entry.")

In contrast, for travelers it is very important not to have the personal belongings that they use in their everyday life confiscated during a trip. In addition, because a shipped package is already out of the owner's possession, having been voluntarily relinquished, there is ***no seizure*** from the owner, regardless of whether it is inspected nearest its final destination, or at some other point along the way. The cases cited by the Government are distinguishable on those grounds. Cf. United States v. Cardona, 769 F.2d 625, 629 (9th Cir. 1985) (although search was reasonable at initiation, seizure of property that did not appear to be contraband required suppression).[8] They simply cannot justify considering this to be a "functional equivalent" case.

Neither the cases cited by the Government, nor the principles of the "functional equivalent" doctrine fit this case. The Tucson search site was not a place where travelers enter or exit the country. It was not the first

---

[8] The Government states that the Cardona's continued vitality has been called into question by a distinction drawn in United States v. Abbouchi, 502 F.3d 850, 855 (9th Cir. 2007). (O.B. at 40.) However, neither Abbouchi nor the other cases that have distinguished Cardona affect its vitality on this point.

place the Cottermans came to rest, nor was it their final destination. So the "functional equivalent" doctrine does not apply.

> 2. The critical distinction between "functional equivalent" and "extended border" cases is that the latter occur ***after*** the first point in time when the entity might have been stopped within the country.

This Court has clearly held that "the main difference between the functional equivalent of the border search and an extended border search is that the latter takes place after the first point in time when the entity might have been stopped within the country." United States v. Guzman-Padilla, 573 F.3d 865, 878 (9th Cir. 2009) citing United States v. Niver, 689 F.2d 520, 526 (5th Cir.1982) and Abbouchi, 502 F.3d at 855-56. See also Gaviria, 805 F.2d at 1112 ("An 'extended' border search is . . . usually is conducted after a person or some property 'has cleared an initial customs checkpoint and [has] entered the United States'") (emphasis added); United States v. Caicedo-Guarnizo, 723 F.2d 1420, 1422 (9th Cir. 1984) (the "extended border" doctrine "permits the Government to conduct border searches some time after the border has been crossed" and "can be valid even when the suspect was already searched at the initial border crossing.") These factors fit the instant case closely because both the

Cottermans and <u>some</u> of their property were searched and cleared at the border before a further search ensued.

The second important reason why this must be analyzed as an "extended border" case is because of its delayed nature. Such searches necessarily entail "a greater level of intrusion on legitimate expectations of privacy than an ordinary border search." <u>Caicedo-Guarnizo</u>, 723 F.2d at 1422-1423. <u>See</u> <u>also</u> <u>Guzman-Padilla</u>, 573 F.3d at 877-878; <u>United States v. Alfonso</u>, 759 F.2d 728, 734 (9th Cir. 1985). That precept is certainly applicable to the present situation. Travelers have a legitimate expectation that their belongings will not be taken away from them at the border and sent to another city for indefinite periods of time without at least a reasonable suspicion that the belongings are connected to wrongdoing. Certainly the Cottermans had formed such an expectation from the times when they had previously traveled abroad (RT 54; ER 107), presumably without having items arbitrarily seized and taken hundreds of miles away from them.

One other point is appropriate to note here. The Government, citing the four consigned shipment cases discussed above, argues that time and distance factors are not dispositive, that such considerations do not undermine their conclusion that this was a "functional equivalent" case and that the court below was wrong to depend on them. (O.B. at 31-33.) The

37

Government is incorrect.  While it is true that time and distance are irrelevant to "functional equivalent" searches, they are important considerations in "extended border" searches such as this.  The factors of time and distance are discussed in more detail below in Section III(B).  It must be noted here, however, that the consideration of time -- in the sense of whether or not the search took place ***at*** the first practicable detention point or ***afterward*** -- is the critical distinction between the Government's favored doctrine (functional equivalent), and the one that the District Court found to be applicable (extended border).  Accordingly, the District Court's application of the extended border doctrine was appropriate.

> 3.  <u>The court below correctly applied the "extended border" doctrine because it aligns with the principles of those cases</u>.

The facts and circumstances of this case do not match the criteria for a "functional equivalent" analysis, but do align with the determining principles for the "extended border" doctrine:

- it occurred "after the first point in time when the entity might have been stopped within the country." <u>e.g.</u> <u>Guzman-Padilla</u>, 573 F.3d at 878;

- it occurred after the border crossing <u>e.g.</u> <u>Alfonso</u>, 759 F.2d at 734;

- the property was unchanged <u>e.g.</u> <u>Sahanaja</u>, 430 F.3d at 1054;

- the time and distance factors were great <u>e.g.</u> <u>Abbouchi</u>, 502 F.3d at 855;

- there was a high level of intrusion upon the expectation of privacy <u>e.g.</u> <u>Alfonso</u>, 759 F.2d at 734.

If this Court were to hold that the Tucson search was at the "functional equivalent" of the border it would be overruling decades of precedent applying that doctrine only at the first point where a conveyance comes to a stop within this country, except in consignment cases. In contrast, the seizure and subsequent search here exhibit all of the hallmarks of cases in which courts have always applied the "extended border" doctrine, with its concomitant requirement of reasonable suspicion.

In short, of the two doctrines, only the "extended border" doctrine fits this case. The Cottermans duly presented themselves at an official POE, submitted valid credentials, and applied for entry. Government agents searched their belongings for more than two hours and found no indication that any crime had occurred. That was the physical border search in this case. The Customs agents could have searched longer, and they could have accessed any files they wanted to, either by asking for the password or by having Agt. Owen bring his laptop computer to the border. They ***chose*** not to do either. Instead, ICE opted to seize the Cottermans' belongings, take them hundreds of miles away, and search there. That

action is completely at odds with the established rationale and fact-pattern of a "functional equivalent" doctrine search, but is within those analyzed under the "extended border" doctrine.

        4.   <u>"Customs custody" or continuous control do not differentiate the two doctrines</u>.

A related topic is the Government's repeated references to the fact that the seized items never "cleared Customs," or had been in custody or continuous control before being searched. (<u>E.g</u>. O.B. at 4, 14, 21, 28, 31-33, 37, 46.) The Government erroneously associates such "custody of customs" with the "functional equivalent" of the border. (O.B. at 31-32.) In fact, however, the cases discussing continuous control do so merely because it ensures that the items remain unchanged since crossing the border. <u>See</u>, <u>e.g.</u>,<u>Sahanaja</u>, 430 F.3d at 1054. The fact that items have not cleared Customs is also a circumstance that exists in many cases involving "extended border" searches as well. <u>See</u>, <u>e.g.</u>, <u>Guzman-Padilla</u>, 573 F.3d at 879; <u>Alfonso</u>, 759 F.2d at 731-32, 734; <u>United States v. Castillo-Garcia</u>, 424 F.2d 482, 483-85 (1970); <u>Alexander</u>, 362 F.2d at 380, 382-83. Thus, to the extent that the Government implies that these circumstances distinguish "extended border" cases from "functional equivalent" cases, it is incorrect. (E.g. O.B. at 27-28, 31-33.)

5.     The *Bennett* case strongly supports the District Court's conclusion that the instant case should be analyzed under the "extended border" doctrine.

One case glossed over by the Government deserves closer consideration. That is <u>United States v. Bennett</u>, 363 F.3d 947, 949-50 (9th Cir. 2004). <u>Bennett</u> is strongly analogous to the present case. In <u>Bennett</u> a law enforcement officer saw a boat traveling north along the California coast, apparently from Mexican waters into U.S. waters. The Coast Guard stopped the boat at the entrance to San Diego Bay. This Court concluded that the initial stop occurred at the "functional equivalent" of the border. <u>Bennett</u>, 363 F.3d at 950-51.

However, after observing certain suspicious facts the Coast Guard seized the boat, stored it overnight, and then hauled it to a Coast Guard facility to x-ray it the next day, disclosing marijuana secreted aboard. <u>Bennett</u>, 363 F.3d at 949. This is analogous to the seizure of the Cottermans' belongings and their transportation away from the border for forensic examination. The boat in <u>Bennett</u> never "cleared Customs," and was not given back to its owner before the forensic examination -- just as the Cottermans' seized property did not "clear Customs," and was not returned to them.

Nevertheless, this Court analyzed that part of the facts in Bennett

under the "***extended border***" analytical framework. Bennett, 363 F.3d at

951. It did not even attempt to analyze them under the "functional

equivalent" doctrine. Id. Thus, Bennett strongly supports the conclusion

that the "extended border" doctrine is the proper rubric for analyzing this

case. In summary the District Court was absolutely correct to analyze this

case under the "extended border" framework.

F.   The Principles for Analyzing Reasonableness Show That this
     Seizure and Search Were Unconstitutional.

The ultimate test for whether any search or seizure can pass Fourth

Amendment muster is whether that search or seizure was reasonable.

"Reasonableness is still the ultimate standard" under the Fourth

Amendment. Camara , 387 U.S. at 537; Sanchez v. County of San Diego,

464 F.3d 916, 932 (9th Cir. 2006). The Government tips its hat to that

concept at pages 26-27 of its Opening Brief. It correctly notes that "[t]he

scope of the intrusion, the manner of its conduct, and the justification for its

initiation must all be considered in determining whether a search comports

with reasonableness." (O.B. at 26 citing Duncan, 693 F.2d at 977.) It

never really analyzes those elements, though. Instead, it simply points to

two places in which the R&R uses the word "reasonable" when describing

the conduct of the agents herein. (O.B. at 27.)

Those references are, however, misleading. Their point was simply that the officers herein acted according to guidelines they were given (which condoned the blatantly unconstitutional seizure of property) and that their behavior was not so extreme as to be the equivalent of destroying the property, or to be analogous to a body-cavity search. That is quite different, however, from finding the search and seizure themselves to have been reasonable. A review of the applicable factors shows that they were not.

      1.   <u>The scope of the intrusion was great</u>.

The scope of the intrusion was great for two reasons. First, the Government seized more than it needed to. It seized not only Mr. Cotterman's computer, but his wife's as well. It copied her entire hard drive, and has kept that copy to this day. In addition, the agents seized a camera, which had already been inspected, and also seized other personal belongings, such as computer cases, personal papers and other property. The Supreme Court has held that "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." <u>Kremen v. United States</u>, 353 U.S. 346 (1957); <u>Terry v. Ohio</u>, 392 U.S. 1, 18 (1968). <u>See</u> <u>also</u> <u>Hill</u>, 459 F.3d at 975-77

43

(criticizing seizure of "the haystack to search for the needle" without showing of necessity).

Second, the scope of the seizure was great because it was extensive in time. It was not the ordinary procedure at the border of stopping a traveler and inspecting his luggage in his presence and then allowing him to depart with his belongings unless contraband is reasonably suspected. (RT 8/27/08 at 99, 101-03; ER 152, 154-56.) Instead, it totally deprived the Cottermans of possession and use their property for days on end. They were unable to access their property -- the kind that Americans use daily -- at all during the time the property was seized. Thus, the wide scope of the intrusion militates against a finding of reasonableness.

### 2. The manner of the seizure was patently offensive.

The "manner" component does so as well. By all accounts, this was no routine border search. Ofc. Alvarado testified that he had never encountered a situation in the four years or so that he worked at the Lukeville POE in which the people were detained at the border in excess of eight hours despite the fact that nothing illegal was found. (Id. at 86,102-03; ER 139, 155-56.)

It is also highly unusual, perhaps unprecedented, for a traveler's belongings to be taken away from the POE for a routine search. Alvarado

testified that when he had previously searched computers for drug records it was always done at the border.  (Id. at 95-96; ER 148-49.)  Two witnesses testified that, when vehicle x-ray machines have broken down the problem is handled by other methods of searching at the border; they do not take cars to Tucson to x-ray them.  (Id. at 41, 103; ER 94, 156.)

It is also unusual to administer Miranda warnings to people when there is no indication of any crime having occurred.  Alvarado testified that they do not Mirandize people, either in the primary or secondary lines, if they have not discovered anything illegal or illicit.  (Id. at 104; ER 157.) Their conduct further demonstrates that this exceeded the bounds of a normal border search.

The basic purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  Camara, 387 U.S. at 528.  In this case the Cottermans entered the POE at 10 am, and were detained while agents conducted an exhaustive search based on the "lookout" for approximately two hours, leaving their personal belongings strewn about.  Then, after finding no indication of wrongdoing, the Government arbitrarily called off the search for hours more, and left the Cottermans cooling their heels while agents from a distant town traveled to the border to seize their property. Those agents had already decided to seize the property before even

starting their trip and could have simply instructed the Border officers to do so.  Instead, it is clear that their mission was to interrogate the Cottermans, in addition to seizing their property, and arbitrarily detaining the Cottermans did not concern them at all.  Moreover, the seizure decision was made in a totally arbitrary manner, simply to exploit the border search exception for ordinary law-enforcement purposes.  They did not bring Agt. Owen to the border, even though he could have searched the computers there.

The battery on the Cottermans' car may have been allowed to go dead from leaving the car doors open, although the record is not clear on that point.  They were left to re-pack their belongings and limp away from Lukeville after eight hours of *de facto* detention.  Suffice it to say that most Americans would be more than a bit upset at being treated in such a high-handed manner.  (RT 8/27/08 at 35-37; ER 88-90.)  Indeed the Magistrate Judge emphasized that the agents acted "presumptively without even considering whether they had reasonable suspicion to seize any of the electronic equipment that day" and in "disregard of the Fourth Amendment in connection with border searches."  (CR 58 at 10; Supp. ER at 12.)  Thus, the manner of this search weighs against a finding of reasonableness.

3.     The justification for the seizure was non-existent.

Finally, the "justification" component strongly weighs against a finding

of reasonableness.  That is because the Government's justification for the

intrusion was non-existent.  This is axiomatic, as there was no reasonable

suspicion of wrongdoing.  This was a classic fishing expedition.

It must also be considered that the primary purpose of a border

search is to seize contraband property sought to be brought into the

country.  Guzman-Padilla  573 F.3d at 877; Alfonso, 759 F.2d at 733.  In

other words, property is searched for possible seizure, not seized to be

searched.  To seize property first in order to search it later stands that

rationale on its head, putting "the cart before the horse," as the District

Court found much of the Government's argument to have done. (CR 58 at

4.)

In addition, a staple of the law regarding whether a given search is

reasonable is that the training and experience of the agents on the scene is

to be given considerable weight.  See, e.g., United States v. Arvizu, 534

U.S. 266, 273 (2002) (noting that officers should draw on their own

experience and specialized training).  In this case, however, nothing was

left to experience and discretion of Customs and Border Patrol agents at

the scene.  Instead they were ordered to cease searching and await

Brisbine and Riley, two agents from a different organization who had less

border experience, and who in turn acted according to what was essentially a "dragnet" issued by an agency in Long Beach.   Thus, this case is characterized by a lack of justification for the actions taken.

4.   Summary

This Court may affirm the District Court on any basis fairly presented by the record that, as a matter of law, sustains the judgment. Dessar v. Bank of America, 353 F.2d 468, 470 (9th Cir.1965).  Regardless of which "border doctrine" applies, the District Court's ruling here was correct because this seizure was simply unreasonable. The scope of the intrusion was great, the manner was offensive, and the justification was non-existent.  Nor can it be supported by the Government's mere desire to avail itself of an opportunity to search an American citizen that it would be forbidden to carry out any place but at the border.  Thus, the search here cannot pass the test of reasonability, and accordingly it violated the Fourth Amendment.

III.   ***The Government's Opening Brief Contains Several Other Erroneous Arguments.***

      A.    The Government's Citations to Statutory Authority Are Not Dispositive Because They Do Not Apply under The Facts of this Case, and Because Statutes Are Subordinate to the Fourth Amendment.

The Government cites a number of statutes and regulations granting it authority to conduct searches at the border.  (O.B. at 17-18.)  This, too, is a generally uncontested proposition -- the Government does have wide authority to search at the border.  The Government is correct that this power is granted by 19 U.S.C. §§ 482 and 1581.  See, e.g., Ickes, 393 F.3d at 503-04.  What is contested, however, is the Government's citation to 19 U.S.C. § 1499(a)(2)(B) as supposedly granting authority to Government officials to indiscriminately take items "off-site" for testing.  (O.B. at 18.)  The statute is inapplicable to this case for three reasons.

First, it is located in Title 19, a section of Code that deals primarily with Customs duties on commercially imported "merchandise," which usually arrives as a consigned shipment as discussed above, not the household goods accompanying citizens returning from vacation.  Cf. Imperial Packaging Corp. v. U. S.  535 F.Supp. 688, 689 - 690 (CIT 1981) (Term "merchandise" as used in 19 U.S.C.A. § 1202 refers to products which are still in the stream of commerce, rather than articles that are

personal effects or commodities in the hands of the ultimate consumer);

United States v. Mattio, 17 F.2d 879, 880 (9th Cir. 1927) ("Merchandise" is

defined broadly in predecessor Tariff Act, but as actually used the meaning

of the word therein is often restricted to what may be regarded as

merchandise in a commercial sense, to the exclusion of 'baggage, personal

effects . . . , ' of which specific mention is made as being in classes by

themselves, and for which there are special provisions.)  Unlike "imported

merchandise," the personal belongings of a returning U.S. citizen are

generally not subject to Customs duties.  See 19 C.F.R. § 148.31 (allowing

returning American residents to bring in duty-free all personal and

household effects taken abroad).  Accordingly, the provisions of 19 U.S.C.

§ 1499(a)(2), allowing Customs officials to determine if "[i]mported

merchandise that is required by law or regulation to be inspected,

examined, or appraised" is in fact "truly and correctly invoiced" are

inapplicable here, because the seized property was returning personal

possessions, not "imported merchandise."

Second, § 1499(a)(2)(B) allows the agents to take the merchandise

to "such place as is designated by the Secretary by regulation for such

purpose."  There was no showing that the place to which the agents took

the Cottermans' personal items was so designated by the Secretary.  Thus,

***on this record*** that provision cannot be said to have authorized these

agents to seize the Cottermans' household possessions without reasonable suspicion and send them to Tucson. Likewise the Government's citation to 19 U.S.C. 1499(b)(1-3) (O.B. at 18) is inapposite because it empowers officials to take items to an accredited private laboratory. The Cottermans' belongings were never taken to any private laboratory in this case, accredited or not.

Finally, even if these statutes, or any others, were intended to have authorized such a thing, they would still be subordinate to the Fourth Amendment to the United States Constitution, which prohibits unreasonable seizures. U.S. Const. Art. VI cl. 2; Almeida-Sanchez, 413 U.S. at 272 ("no Act of Congress can authorize a violation of the Constitution"); Younger v. Harris, 401 U.S. 37, 52 (1971) (Courts cannot apply statute that conflicts with the Constitution) citing Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803). Thus, the Government's citations to statutes and regulations are unavailing for the proposition that the seizure in this case without reasonable suspicion was lawful. The real issue is whether or not the seizure was constitutional. It was not.

B.  The Government Misconstrues and Misapplies the Law Regarding Time, Distance and Delay Factors.

The Government's assertion that "'time and place'…are not dispositive" (O.B. at 20) stems from statements in the early "extended border" cases.  As the case law has evolved, however, time and distance have became more, not less, important in deciding whether to analyze cases under that doctrine.  Time and distance were the primary factors in the following Ninth Circuit cases analyzed under the "extended border" doctrine: Alfonso, 759 F.2d 728; Cardona, 769 F.2d 625; United States v. Mejias, 452 F.2d 1190 (9th Cir. 1971); Sahanaja, 430 F.3d 1049; United States v. Whiting, 781 F.2d 692 (9th Cir. 1986).  See also United States v. Yang, 286 F.3d 940, 947 (7th Cir. 2002).

A similar fallacy in the Government's Brief is that extended border searches "typically" involve breaks in custody, "where custody of an item was returned by Customs to the item's custodian, or custody was never taken by Customs at the border."  (O.B. at 34.)  A review of the cases cited by the Government for that proposition, however, discloses that none actually involved items being returned to a custodian.  That is not a distinguishing factor between the "extended border" and "functional equivalent" doctrines.

52

The Government also cites <u>United States v. Espericueta-Reyes</u>, 631 F.2d 616 (9th Cir. 1980) for the proposition that breaks in custody and delays to enable surveillance of suspects (which did not occur herein) are supposedly "the primary application" of the "extended border" doctrine. (O.B. at 36.)  That may have been typical 30 years ago, but as this Court has recently noted, "this motivation scarcely has been discussed in the numerous extended border search cases" decided by this Court "since <u>Espericueta-Reyes</u>."  <u>Guzman-Padilla</u>, 573 F.3d at 883, n.2.

A related issue is the Government's erroneous claim that the Magistrate Judge "attempted to fashion a hard and fast 'time/distance' limit to border search authority." (O.B. at 30.)  Actually, the Magistrate Judge emphasized just the opposite: "Again, there is no bright line test," applying instead "an examination of the totality of the circumstances." (CR 58 at 7, 8; Supp. ER at 9, 10.)  And although the Government claims that the District Court is "forcing law enforcement authority to comply with artificial time constraints" (O.B. at 24, 42), the Magistrate Judge actually noted in his totality-of-circumstances analysis that each border search stands on its own facts and circumstances.   (CR 58 at 7-8; Supp. ER at 9-10.)  It is thus the Government's argument that is "artificial," because it ignores and misstates the actual ruling in this case.

53

C.  The Government Ignores the Well-Established Distinction between search and seizure.

Additionally, the Government's repeated refrain in its Opening Brief that the Cottermans' belongings were "lawfully seized" (O.B. at 3, 22) is wrong in three respects.  First, it implies that the District Court found the initial seizure "lawful" --  it did not.  (CR58 at 11; Supp. ER at 13.)  Second, it conflicts with the Government's own claim that the item was not "seized," but was merely "detained."  (OB at 3, 29.)  Finally, it is logically unsound because its premise is also its conclusion -- that the items were "lawfully seized" at the border to begin with.  As the court below noted, this is a circular argument.  (CR 58 at 4; Supp. ER at 6.)

The Government attempts to gloss over the distinction between search and seizure with citations to distinguishable cases.  For example, the Opening Brief cites the case of United States v. Burnette, 698 F.2d 1038 (9th Cir. 1983).  (O.B. at 22-23.)   In that case police officers looking for money stolen from a bank seized and searched a purse full of cash from a woman incident to her arrest, and examined it again later at a police station, finding incriminating evidence.   This Court held the second search to be lawful partly because the woman's expectation of privacy was already lessened by the initial lawful search.

Importantly, however, Ms. Burnette's possessory interest in the purse was never an issue. The seizure there was lawful under the "search incident" exception. Here, in contrast, the Cottermans were not arrested, and there was no basis in law for the initial seizure of their property at the border. Thus, although the Cottermans' belongings were lawfully ***searched*** at the border, they were never lawfully ***seized***, as was the purse in Burnette. Burnette is certainly not authority for the proposition that an officer lawfully searching an item, who finds no indication of wrongdoing, may nevertheless seize it and take it anywhere he wants without reasonable suspicion that it contains anything illegal. On the contrary, the Cardona case, discussed above, holds the opposite. Cardona, 769 F.2d at 629 (where initial search was lawful, but seizure of checks was unjustified, suppression was still required).

The Government also ignores the distinction between search and seizure in its discussion of Hill, 459 F.3d 966. (OB at 23-24.) Like Burnette, Hill is inapplicable to the present case because the initial seizure was lawful -- police had a warrant allowing them to take it. Hill, 459 F.3d at 973-74. Hill does not support the Government's principal proposition, which is that its power to ***search*** goods at the border also authorizes it to ***seize*** those goods and take them far away for inspection without benefit of a warrant.

55

D.   This Case Does Not Present the Government's Imagined
     Scenarios.

The Government reaches far beyond the circumstances of this case

to create misleading hypothetical situations that lead to outlandish

"ramifications."  (OB at 42-45.)  They erroneously attribute "decisions" to

the District Court premised on a hypothetical case in which a search at the

border would be impracticable. As established above, however, a sufficient

search could have been conducted at the border in the instant case.  The

District Court's ruling states nothing about situations in which a search at

the border would be impracticable.  That is an issue for another case and

another day.  In the interest of completeness this section addresses the

imagined scenarios, but without conceding that they are a proper part of

this appeal.

1.   Border officers can and do find pornography without a
     forensic lab.

For example, the Government argues in several places that, in the

event this Court does not find that border officers had unlimited power to

seize the Cottermans' belongings and take them wherever any agent wants

without a reasonable suspicion of wrongdoing, that they will have to place a

computer forensics lab with trained personnel at every border crossing, at

great expense.  (O.B. at 24, 42-46.)  That is an absurd argument.

The case law amply demonstrates that Customs officials are highly adept at detecting child pornography at border crossings without any such facilities.  See, e.g., Arnold, 533 F.3d 1003, Romm, 455 F.3d 990, Ickes, 393 F.3d 501, Roberts, 274 F.3d 1007.  The customs agents in those cases required no forensic laboratories to find the pornography.  Preliminary forensic searches may not find all contraband, but that will always be true because not every computer crossing the border can practicably be searched.  It is the fact that the Government **_may_** search that has the deterrent effect.

2.      The agents can also ask the traveler to access files.

Moreover, there are numerous other alternatives to building forensic labs at every port.  For example, in this case the agents could have chosen to ask Mr. Cotterman for the password for any file they wanted to see, or Agt. Riley could have instructed Ofc. Alvarado to do so, at least to the point of resolving the hunch.  Alternatively, when Mr. Cotterman offered to help Agts. Riley and Brisbine access his computer, they could have simply taken him up on that offer.  It is not clear from the record what the results of so doing either of these would have been, but the fact that the agents did not even ask him certainly shows how unreasonable their decision was.  Instead, they just decided without ever meeting Mr. Cotterman that his

belongings were to be seized, taken from him and subjected to extended laboratory analysis at a distant location, merely because someone in Long Beach thought they could get away with it. Finally, the agents could have taken Agt. Owen and his laptop computer to the border with them. Thus, to say that the Government would have to build forensic labs at every POE (O.B. at 25) is simply catastrophizing.

The Government's principal objection to asking for a traveler's help is the possibility that a person could somehow "booby trap" files so that the computer would delete them if accessed. (RT 8/27/08 at 39, 50; ER 92-103; OB at 25.) This possibility came, not from their computer expert, Agt. Owen, but from Agt. Riley, who admitted having little computer expertise of her own. (RT 8/27/08 at 40; ER 93.) Even if one were to credit such a concern based on this record, it would not justify the seizure of a person's belongings without a reasonable suspicion of wrongdoing. If the Government insists on inspecting people's computers to the n-th degree at the border, this may be one possible hazard of doing so, but the mere fact that there is some possibility of unknown magnitude that a file may be deleted does not make it reasonable to seize people's property randomly and take it far away from the border for an unlimited time period in the absence of any indication of wrongdoing.

Moreover, if a deletion occurred, it would justify seizing the computer and taking it to a laboratory to reinstate the file. The record in this case shows that computer files are usually recoverable. And even in the unlikely event that a file were somehow destroyed beyond restoration, it would actually satisfy the Government's mission of preventing such files from crossing the border. This off-chance possibility is just not enough reason to justify the seizure in this case. Instead, it is simply the Government's own attempt to justify seizure without due respect for the rights of traveling American citizens.

3. <u>The mere possibility that files may exist in unallocated space does not justify a seizure</u>.

Agt. Riley also noted a concern that she might not be able to see some files with her "naked eye." (<u>Id</u>. at 39; ER 92; O.B. at 25.) Presumably this is a reference to files that may exist in unallocated space, <u>i.e.</u> those that were never purposely saved, or were deleted. (<u>Id</u>. at 123-24; ER 176-77.) However, the record in this case indicates that such files are probably not accessible to the computer's owner either. In addition, even finding such files would not justify the person's arrest. (<u>Id</u>. at 137-38; ER 190-91.) Moreover, as previously established, Agt. Owen could have found these at the border, probably within hours.

In addition, this too is simply another limitation inherent in the nature of a border search.  A border search may not give the Government everything it wants, but it is what the Constitution allows in the absence of a reasonable suspicion of wrongdoing.  It would be as wrong to hold that all limitations imposed by the very nature of a border search can be disposed of, as it would be to hold that the constitutional requirements for any other search can be disposed of in order to make life easy for law enforcement.

4.     <u>The Government's preferred solution - seizure of a traveler's property - remains readily available when there is a reasonable suspicion of criminal activity.</u>

In addition, the Government's argument ignores the fact that all the lower court held is that to justify an extended border search it needed a ***reasonable suspicion*** -- the lowest standard of evidence in criminal law. Not satisfied with this tremendous latitude, the Government now demands absolute power to seize travelers' personal belongings without even a founded suspicion that a crime has taken place.  That is simply not a reasonable position, and therefore does not satisfy the Fourth Amendment's requirements.

IV.   ***It Would Be Unreasonable to Extend the Border Exception this
      Far in Order to Justify a Search That Would Be Constitutionally
      Impermissible Away from the Border***.

The Government's argument comes down to the proposition that

because it ***may*** inspect a traveler's computer at the border, then it ***must*** be

allowed to take it away from the border, because computers are too hard to

search at the border.  (O.B. at 25-26, 42-46)   At bottom, the Government

seeks to use this case to turn the "border search" exception into a gigantic

loophole.  Combined with the powers to examine computers affirmed under

cases such as <u>Arnold</u>, it would allow the Government to selectively "target"[9]

certain American citizens for searches that are really aimed not at border

enforcement, but at general law enforcement, and which would be plainly

illegal if done away from the border.  Here, the facts show that Government

agents entered "lookouts" for citizens who have paid their debt to society,

in order to exploit the border-search exception to conduct searches that

would not be allowed elsewhere.  This Court has condemned similar

practices.  <u>Cf</u>. <u>United States v. $124,570 U.S. Currency</u>, 873 F.2d 1240,

1246-47 (9th Cir.1989) (disparaging use of airline-security search for

general law enforcement); <u>United States v. Bulacan</u>, 156 F.3d 963, 967

(9th Cir.1998) (scheme of searching packages brought into federal

---

[9]  This is the Government's own word. (RT 8/27/08 at 12; ER 65.)

buildings not only for weapons, but also for drugs, was not reasonable and violated Fourth Amendment).  Cf. also City of Indianapolis v. Edmond, 531 U.S. 32, 37-42 (2000) (distinguishing between highway checkpoints set up for border-protection purposes and those whose primary purpose is to detect "evidence of ordinary criminal wrongdoing.")  In those cases, as in this, the Government abused its power, although in different ways.

While the defense does not contend that such "targeting" is *per se* unconstitutional, we do assert that the "border search" exception should not be converted into a loophole allowing items to be taken away from the border without suspicion of wrongdoing in order to make it more convenient for the Government to do what our Constitution plainly forbids it from doing away from the border in the first place.  In short, for the Government to rest on its "border search" powers it is only logical that it be required to do so ***at the border*** itself, even though that may not be convenient, unless agents have at least a reasonable suspicion that more is needed.

In sum, the Government already has a wide variety of techniques at its disposal to search and seize travelers' belongings.  Giving it the unbridled power to seize and retain control of personal property without any justification may provide even more help for law enforcement, but that can never be the overriding consideration.  As our Supreme Court has pointed out:

The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.

Almeida-Sanchez, 413 U.S. at 273.

## VI.   **CONCLUSION**

This is not an abstract case about computers but is about particular facts and circumstances and should be limited to them.  Stretching the border search exception beyond its breaking point, the Government asks this Court to abandon decades of precedent and break new ground to find this search and seizure to have been conducted at the border, or its functional equivalent.  In fact, however, the lower courts were absolutely correct in holding that the "extended border" doctrine provided the applicable analytical framework, and accordingly the search was unconstitutional because the agents did not have the reasonable suspicion of wrongdoing required by that doctrine to justify seizing the property of travelers.  In addition it was unreasonable because of its excessive scope, its presumptuous manner, and its lack of justification.  For those reasons, as well the others set forth above, this Court should affirm the District Court's  decision in this matter.

DATED this 30TH day of December, 2009.

Law Office of Nash & Kirchner, P.C.
Attorneys for Defendant
Howard Wesley Cotterman


 /s   William J. Kirchner         
William J. Kirchner

## <u>STATEMENT OF RELATED CASES</u>

There are no related cases pending in this Court at this time, to the knowledge of counsel undersigned.


December 30, 2009                    /s William J. Kirchner
                                     Counsel for Howard Cotterman

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NO. 09-10139

I hereby certify that, Pursuant to Fed. R. App. P. 32(a)(7)(C) and

Ninth Circuit Rule 32-1, the attached Answering Brief is Proportionately

spaced, has a typeface of 14 points or more and contains 13,995 words.

(Opening, answering, and the second and third briefs filed in cross-appeals

must not exceed 14,000 words; reply briefs must not exceed 7,000 words.)


December 30, 2009                    /s William J. Kirchner
                                     Counsel for Howard Cotterman

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of December, 2009, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished  by the appellate CM/ECF system.

DATED this 30th day of December, 2009.

  /s/ WILLIAM J. KIRCHNER