No. 09-10139

IN THE

# United States Court of Appeals
# for the Ninth Circuit

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

HOWARD WESLEY COTTERMAN,

Defendant-Appellee.

———————

On Appeal from the United States District Court
for the District of Arizona
The Honorable Raner C. Collins
District Court Case No. 4:07-cr-01207-RCC-CRP-1

———————

**BRIEF *AMICUS CURIAE* OF THE CONSTITUTION PROJECT
IN SUPPORT OF APPELLEE'S
PETITION FOR REHEARING EN BANC**

———————

| | |
|---|---|
| SHARON BRADFORD FRANKLIN | CHRISTOPHER T. HANDMAN |
| The Constitution Project | MARY HELEN WIMBERLY |
| 1200 18th Street, N.W. | Hogan Lovells US LLP |
| Suite 1000 | 555 Thirteenth Street, N.W. |
| Washington, D.C. 20036 | Washington, D.C. 20004 |
| (202) 580-6928 | (202) 637-5719 |
| sfranklin@constitutionproject.org | chris.handman@hoganlovells.com |
| Dated: September 22, 2011 | Counsel for *Amicus Curiae* |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, *amicus* makes the following disclosure statement:

The Constitution Project is a not-for-profit organization. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

 /s/ Christopher T. Handman
Christopher T. Handman

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST OF AMICUS CURIAE ...........................................1

INTRODUCTION ...........................................................................2

ARGUMENT .................................................................................5

I.    THE PANEL MAJORITY'S RULE RAISES A QUESTION
      OF EXCEPTIONAL AND RECURRING IMPORTANCE IN
      THE DIGITAL ERA ...............................................................5

II.   REHEARING IS FURTHER WARRANTED BECAUSE IT
      OFFENDS BASIC FOURTH AMENDMENT LAW TO LET
      THE GOVERNMENT SEIZE AN INDIVIDUAL'S
      ELECTRONIC DEVICE WITHOUT SUSPICION MERELY
      TO CONDUCT A FORENSIC SEARCH OF THE DEVICE.....................12

III.  REHEARING IS WARRANTED TO ENSURE THAT
      SEARCHES INVOLVING PERSONAL ELECTRONIC
      DEVICES AT THE BORDER ARE NOT CONDUCTED
      ARBITRARILY ...................................................................17

CONCLUSION ..............................................................................19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*Ashcroft* v. *al-Kidd*,
131 S. Ct. 2074 (2011) ...........................................................................1

*Flippo* v. *West Virginia*,
528 U.S. 11 (1999).............................................................................5, 17

*General Dynamics Corp.* v. *United States*,
131 S. Ct. 1900 (2011) ...........................................................................1

*Katz* v. *United States*,
389 U.S. 347 (1967)................................................................................5

*Kremen* v. *United States*,
353 U.S. 346 (1957)..............................................................................16

*Thompson* v. *Louisiana*,
469 U.S. 17 (1984)...........................................................................5, 17

*United States* v. *Abbouchi*,
502 F.3d 850 (9th Cir. 2007) ...........................................6, 13, 14, 15

*United States* v. *Arnold*,
533 F.3d 1003 (9th Cir. 2008) ....................................10, 11, 12, 13

*United States* v. *Caicedo-Guarnizo*,
723 F.2d 1420 (9th Cir. 1984) ...........................................13, 14, 16

*United States* v. *Cotterman*,
637 F.3d 1068 (9th Cir. 2011) ................................................. *passim*

*United States* v. *Flores-Montano*,
541 U.S. 149 (2004)................................................................. *passim*

*United States* v. *Montoya de Hernandez*,
473 U.S. 531 (1985)...................................................................3, 6, 13

## <u>TABLE OF AUTHORITIES</u>—Continued

<u>Page</u>

*United States* v. *Ramsey*,
    431 U.S. 606 (1977)...............................................................................5, 6, 13, 16

*United States* v. *Seljan*,
    547 F.3d 993 (9th Cir. 2008) (en banc) ...................................................... *passim*

*United States* v. *Sutter*,
    340 F.3d 1022 (9th Cir. 2003) ..............................................................................6

## CONSTITUTIONAL PROVISION:

U.S. Const. amend. IV ...................................................................................... *passim*

## RULE:

Fed. R. App. P. 29(c)(5).............................................................................................1

## OTHER AUTHORITIES:

Apple, *iPod Classic: Technical Specifications*,
    http://www.apple.com/ipodclassic/specs.html (last visited Sept. 8, 2011) ..........9

Department of Homeland Security, *Privacy Impact Assessment for the
    Border Searches of Electronic Devices* (2009) ...................................................7

Liberty & Sec. Comm., The Constitution Project, *Suspicionless Border
    Searches of Electronic Devices: Legal and Privacy Concerns with
    The Department of Homeland Security's Policy* (2011) ........................... *passim*

University of California, Berkeley School of Information, *How Much
    Information? 2003* (2003)..................................................................................8, 9

iv

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

The Constitution Project (Project) is an independent, bipartisan organization that promotes and defends constitutional safeguards. The Project brings together legal and policy experts from across the political spectrum to promote consensus solutions to pressing constitutional issues. It has appeared regularly before federal courts in cases raising important constitutional questions. *See, e.g.*, *Ashcroft* v. *al-Kidd*, 131 S. Ct. 2074 (2011); *General Dynamics Corp.* v. *United States*, 131 S. Ct. 1900 (2011).

After September 11, 2001, the Project created its Liberty and Security Committee, which comprises members of the law enforcement community, legal academics, former government officials, and advocates from across the political spectrum, to address the importance of preserving civil liberties as we work to protect our Nation from international terrorism. This Committee has recently published a report addressing the very issue currently pending before this Court. In May 2011, the Committee released *Suspicionless Border Searches of Electronic Devices: Legal and Privacy Concerns with The Department of Homeland*

---

[1]  Pursuant to Rule 29(c)(5) of the Federal Rules of Appellate Procedure, *amicus* certifies that all parties have consented to the filing of this brief. *Amicus* likewise certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amicus* and its members and counsel contributed money intended to fund the brief's preparation or submission.

1

*Security's Policy*, in which its signatories urged the Department of Homeland Security (DHS) to discontinue its policy of searching electronic devices at the border without reasonable suspicion. It explained that such searches "contravene well-established Fourth Amendment principles," "have a chilling effect on free speech," and "can open avenues for other constitutional abuses, such as racial or religious profiling."[2]

This is precisely the type of search that was conducted in the present matter. Accordingly, the Project files this brief in support of Appellee to urge the Court to rehear the case *en banc* because it raises important questions about the scope of the Fourth Amendment's protection of individuals' computers and similar electronic devices at the border.

## INTRODUCTION

This Court, sitting *en banc*, has refused to endorse the limitless rule that "at the border, anything goes." *United States* v. *Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc). But the divided panel in *United States* v. *Cotterman*, 637 F.3d 1068 (9th Cir. 2011), has turned around and done just that. Its holding—that a laptop may be subject to seizure for two days and then transported over 170 miles

---

[2]    Liberty & Sec. Comm., The Constitution Project, *Suspicionless Border Searches of Electronic Devices: Legal and Privacy Concerns with The Department of Homeland Security's Policy* 2 (2011) (hereinafter Project Report), *available at* http://www.constitutionproject.org/pdf/Border_Search_of_Electronic_Devices_0518_2011.pdf.

merely because it was searched initially at the border—essentially allows the traditionally narrow border exception to eviscerate entirely the protections of the Fourth Amendment. Although noting in passing the principle that there must be some ascertainable limits to the manner in which a border search may be performed, *see id.* at 1070, 1079, the majority failed to put this principle into practice. Instead, its ruling allows border officials to detain personal property and remove that property from the border into the interior, so that the officials may "fully allay [their] concerns that [the property] contained contraband." *Id.* at 1077. This contravenes fundamental Fourth Amendment principles, which require that any search or seizure be *reasonable*.

What is reasonable necessarily depends on the circumstances of the particular search or seizure at issue. *United States* v. *Montoya de Hernandez*, 473 U.S. 531, 537 (1985). But the majority gave short shrift to the relevant circumstances in *Cotterman* and relied on dated precedent that does not embrace the challenges of the rapidly changing digital age. As a result, the majority fundamentally misunderstood the privacy interests at stake and failed to fully appreciate the nature of electronic media: it is qualitatively different from anything else. Both the *type* of information that we regularly carry around with us on our laptops and cell phones and the *volume* of that data is unique and historically unparalleled. In this regard, a laptop is different from a vehicle, a piece

3

of luggage, or a mailed letter—the sorts of items that customarily were at issue when the border exception was first formulated by the courts. Electronic devices that store binary digital information—totaling billions of pages if physically printed out—are fundamentally different. The law therefore needs to catch up with advances in technology in order to bring the Fourth Amendment into the modern era and in order to define what is a reasonable search or seizure in the digital age.

If left standing, the ramifications of the *Cotterman* majority's holding are enormous. Between October 1, 2008 and June 2, 2010 alone, over 6,500 people were subjected to searches of their electronic media at the border. Project Report 1.[3] Nearly half of these people were United States citizens. *Id.* Countless more regularly carry their cell phones, laptops, handheld devices, and other electronic media on international travel everyday. According to the panel majority, however, a border official, *for no reason whatsoever*, may review all data collected in that media, hold the device for multiple days, and send it hundreds of miles away for further analysis. An official could, for example, seize an MP3 player from a college student returning from study abroad simply to ensure that all the songs stored on the device were downloaded legally (even if they had all been downloaded *in this country*). This has nothing to do with protecting the integrity

---

[3] The Project drew this information from the ACLU's analysis of data obtained from the government through FOIA.

of our border. Such a gross expansion of the border search exception warrants rehearing *en banc*. Accordingly, this Court should rehear the case *en banc* in order to resolve questions of exceptional importance, to ensure that the border search doctrine does not become the exception that swallows the rule, and to recognize the heightened privacy interests that are implicated in the search or seizure of electronic storage devices.

## ARGUMENT

## I. THE PANEL MAJORITY'S RULE RAISES A QUESTION OF EXCEPTIONAL AND RECURRING IMPORTANCE IN THE DIGITAL ERA.

1. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. To that end, a search conducted without a warrant is "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States*, 389 U.S. 347, 357 (1967) (footnote omitted); *accord Flippo* v. *West Virginia*, 528 U.S. 11, 13 (1999); *Thompson* v. *Louisiana*, 469 U.S. 17, 21 (1984). The border search doctrine is one such exception. *United States* v. *Ramsey*, 431 U.S. 606, 621 (1977); *Seljan*, 547 F.3d at 999. It is justified by "the Government's paramount interest in protecting the border." *United States* v. *Flores-Montano*, 541 U.S. 149, 155 (2004).

But the fact that the warrant requirement is suspended at the border does not mean that "anything goes." *See Seljan*, 547 F.3d at 1000. A border agent's search authority is "subject to substantive limitations imposed by the Constitution." *Ramsey*, 431 U.S. at 620. Specifically, "[b]alanced against the sovereign's interests at the border are the Fourth Amendment rights of respondent." *Montoya de Hernandez*, 473 U.S. at 539. And although "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border," *id.* at 540, the individual's rights are not rendered nugatory.

Given that the border search exception is just that—an exception—it has been described repeatedly by this Court as "narrow." *See*, *e.g.*, *Seljan*, 547 F.3d at 999; *United States* v. *Sutter*, 340 F.3d 1022, 1025 (9th Cir. 2003); *United States* v. *Abbouchi*, 502 F.3d 850, 854 (9th Cir. 2007). The majority's ruling, however, substantially expands the scope of the exception, allowing for the search, seizure, and transport of property *hundreds of miles* beyond the border, *without any suspicion* of a security threat or the existence of any type of contraband. As explained below, this goes far beyond the reasons justifying the existence of the exception, and is anything but "narrow."

2. Both the *nature* of the information and the *volume* of that information— some of it totally unknown to its user—make electronic devices such as laptops

6

entitled to greater privacy protections to preserve the historically narrow scope of the border exception. Most of us keep highly personal information on electronic devices, which we carry with us everyday and on travel, within this country and without. As the Project explained in its Report, historically "[a]s a practical matter, most private documents, letters, photographs, and other personal effects would remain in an individual's home, safeguarded by full Fourth Amendment protections and the warrant requirement. With today's technology, however, people can and do travel with vast quantities of private, personal information stored on their laptops and other electronic devices." Project Report 2. DHS has even recognized as much, describing the "central privacy concern" of border searches of electronic devices as "the sheer volume and range of types of information available on electronic devices as opposed to a more traditional briefcase or backpack." DHS, *Privacy Impact Assessment for the Border Searches of Electronic Devices* 2 (2009). "Where someone may not feel that the inspection of a briefcase would raise significant privacy concerns because the volume of information to be searched is not great, that same person may feel that a search of their laptop increases the possibility of privacy risks due to the vast amount of information potentially available on electronic devices." *Id.*

DHS appropriately described the privacy concerns raised by the border search of electronic devices as "unique." *Id.* at 3. A person who would never

7

carry abroad hard copies of legal documents, personal pictures, or private writings may nevertheless transport electronic versions of these items across the border—possibly without being fully aware of doing so—merely by traveling with a laptop. Or a person who would never voluntarily subject to governmental inspection his or her medical appointments, confidential business e-mails, or other such sensitive data—may do so inadvertently by carrying a Blackberry or iPhone abroad. Even someone who has made efforts to protect his or her privacy by deleting material before traveling is vulnerable: that data may still be mined by border agents using forensic software. Those with less computer savvy likely have no idea that when traveling with their laptops, they are carrying around their full web browsing histories. As the Project reported: "Computers * * * store * * * information on web sites visited. This can include cookies and other metadata that the individual does not even know exists on his or her computer and can cover a period of several years." Project Report 7. The *nature* of this stored information is highly personal and makes it deserving of unique protections—on par with those for searches of a person.

The sheer volume of data stored in electronic format is staggering. A 2003 study issued by the University of California, Berkeley School of Information

8

reported that, in 2002, the world produced 5 *exabytes*[4] of new information, 92% of which was stored on magnetic media (i.e., hard drives).  Berkeley School of Information, *How Much Information? 2003* at 1 (2003) (hereinafter Berkeley Study).  Only 0.01% of that data was stored in hard copy.  *Id.*  To put this in some perspective,[5] 5 exabytes divided by a world population of 6.3 billion in 2002 equals 800 megabytes of recorded information per person for that year.  *Id.* at 2.  It would take *30 feet of books* to represent the equivalent of 800 megabytes of data on paper.  *Id.*

The average American, of course, has far more data stored on electronic devices.  The United States alone produces 50% of all information stored on magnetic media.  *Id.*  To use a popular example—currently available iPods hold between 2 and 160 gigabytes of data.  Apple, *iPod Classic:  Technical Specifications*, http://www.apple.com/ipodclassic/specs.html (last visited Sept. 8, 2011).  Just one gigabyte of data is equivalent to *an entire pickup truck* filled with books.  Berkeley Study 3.

---

[4]     One exabyte is $10^{18}$ bytes—i.e., one quintillion (1,000,000,000,000,000,000) bytes.

[5]     Of course, the Berkeley Study relied on data that is now almost 10 years old.  To give some indication of current numbers, at least between 1999 and 2002, new stored information grew at a rate of approximately 30% per year.  Berkeley Study 2.

The important point is that electronic storage devices bear little resemblance to their analog cousins like briefcases and backpacks. And any Fourth Amendment rule that categorically dismisses those differences is just an anachronism that undermines the Fourth Amendment as well as the narrow border exception rule itself. After all, it is almost impossible to draw any realistic comparison between transporting vehicles or luggage with the transportation of a laptop. The amount of information contained in a computerized device simply was unfathomable at the time the border search exception was conceived. Rehearing is warranted to bring the border exception rule into alignment with modern technology and American ways of life.

3. The Supreme Court has recognized that certain heightened privacy interests warrant greater protection at the border. *See Flores-Montana*, 541 U.S. at 152. The Court spoke in terms of "highly intrusive searches of the person" and noted that such "dignity and privacy interests of the person being searched[ ]simply do not carry over to vehicles" subjected to search at the border. *Id.* But the Court did not, as the panel majority suggests, preclude a finding that a person could ever have such a heightened interest in property. *See Cotterman*, 637 F.3d at 1080 & n.14.

In concluding that privacy concerns in property are *never* relevant at the border, the majority relied on the decision of a prior panel, *United States* v. *Arnold*,

533 F.3d 1003 (9th Cir. 2008), which concluded that "[t]he Supreme Court's analysis [in *Flores-Montano*] determining what protection to give a vehicle was not based on the unique characteristics of vehicles with respect to other property, but was based on the fact that a vehicle, *as a piece of property*, simply does not implicate the same 'dignity and privacy' concerns as 'highly intrusive searches of the person.' " *Arnold*, 533 F.3d at 1008 (emphasis added) (quoting *Flores-Montano*, 541 U.S. at 152). The Supreme Court did not go that far, however. It did *not* hold that a vehicle was subject to less protection *because it was property*; it merely held that the dignity and privacy concerns implicated in searches of persons did not apply to searches of *vehicles*. *See Flores-Montano*, 541 U.S. at 152. Both the panel majority and the panel in *Arnold* therefore relied on a misinterpretation of the Supreme Court's holding. That divergence with binding Supreme Court authority warrants rehearing by this Court.

Moreover, this misinterpretation led to the panel majority's conclusion that the search of a laptop at the border did not require reasonable suspicion because it was no different than the search of a vehicle or luggage. *See Cotterman*, 637 F.3d at 1080 (citing *Arnold*, 533 F.3d at 1008). The majority relied again on *Arnold*, where the prior panel had reasoned in relevant part that "case law does not support a finding that a search which occurs in an otherwise ordinary manner, is 'particularly offensive' simply due to the storage capacity of the object being

11

searched." 533 F.3d at 1010. But this analysis grossly oversimplifies the issue. And where *Arnold* misconceived this issue, the panel majority ignored it entirely.

## II. REHEARING IS FURTHER WARRANTED BECAUSE IT OFFENDS BASIC FOURTH AMENDMENT LAW TO LET THE GOVERNMENT SEIZE AN INDIVIDUAL'S ELECTRONIC DEVICE WITHOUT SUSPICION MERELY TO CONDUCT A FORENSIC SEARCH OF THE DEVICE.

1. The panel majority found "no basis under the law to distinguish the border search power merely because logic and practicality require some property presented for entry—and not yet admitted or released from the sovereign's control—to be transported to a secondary site for adequate inspection." 637 F.3d at 1070. The search in this case had begun at the border, but had ended "two days later in a Government forensic computer laboratory almost 170 miles away." *Id.* The Government has not (and could not reasonably have) argued that its laboratory is the functional equivalent of the border. And it has not argued on appeal that there was "reasonable particularized suspicion of criminal activity to support the search under the extended border search doctrine." *Id.* at 1074 (footnote omitted). This means that, in order to be valid, the search must fall within the standard border search exception.

The border search exception to the warrant requirement of the Fourth Amendment is defined specifically in reference to a place—*the border*. Thus, even in *Arnold*, the panel expressly limited its ruling to searches actually at the border;

12

the panel did not suggest any search beyond the border would be constitutional. *See* 533 F.3d at 1008 ("reasonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices *at the border*") (emphasis added). Not surprisingly, the exception is almost universally described as applying only to searches and seizures taking place *at the border*. *See, e.g.*, *Flores-Montano*, 541 U.S. at 155 ("the Government's authority to conduct suspicionless inspections at the border"); *Montoya de Hernandez*, 473 U.S. at 537 ("the Fourth Amendment's balance of reasonableness is qualitatively different at the international border"); *Ramsey*, 431 U.S. at 616 ("searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border").

Of course, there is a commonsense expansion of the border search doctrine to places that constitute the "functional equivalent" of the border. *See Abbouchi*, 502 F.3d at 855. But this does not mean that any search or seizure somehow tangentially related to the border is *per se* reasonable. Rather, this Court has long recognized that where a search or seizure takes place beyond the border, additional protections kick in, such as the requirement that there be reasonable suspicion. *See, e.g.*, *United States* v. *Caicedo-Guarnizo*, 723 F.2d 1420, 1422 (9th Cir. 1984) (describing the extended border doctrine).

13

2.  But the panel majority has expanded the border search doctrine well beyond the border, without also imposing the additional protections this Court has concluded are necessary to such an expansion.  *See id.*  The majority reasoned that it would not apply the "rigid and simplistic" rule that "relies on the simple physical act of moving beyond the border" to require greater suspicion.  *Cotterman*, 637 F.3d at 1076.  But its analysis conflated the border search doctrine, the functionally equivalent border doctrine, and the extended border search doctrine—thus minimizing the importance of the role of the actual physical border.  For example, the majority relied on *Abbouchi* to criticize the district court for using "a 'comparison of absolute time and spatial differences alone'[ ]to distinguish the border search doctrine."  *Id.* at 1076 (quoting *Abbouchi*, 502 F.3d at 855).  The majority then essentially discounted these considerations entirely, concluding that "we will not confuse a search authorized by the border search power with an extended border search simply because the property was removed from the border."  *Id.* at 1078-79 (citing *Abbouchi*).

That gets things backwards.  The quoted language from *Abbouchi* concerned the difference "between a search at the border's functional equivalent and an extended border search."  *Abbouchi*, 502 F.3d at 855.  And although the *Abbouchi* court did conclude that "comparison of absolute time and spatial differences alone is not enough to distinguish" the two—what it listed as an additional consideration

14

is telling.  *Id.*  The court continued:  "Rather, we also look to whether the search * * * occurred at the last practicable opportunity before its passage over the international border."  *Id.*  Thus, far from being irrelevant, the additional factor that the *Abbouchi* court considered was directly related to the *place* of the search.  And because the issue was whether the search occurred at the functional equivalent of the border, the additional factor related to the *function* of the location.  But here is the important part—the functionally equivalent border doctrine is *not* implicated in the present case.  The additional factor considered by the court in *Abbouchi* is therefore irrelevant here.  What remains is the *temporal and spatial differences* to determine whether the search falls under the border search doctrine or the extended border search doctrine.

This is one of those cases where the answer is really as simple as it seems: The search did not take place at the border—far from it.  Cotterman's laptop was transported to a government laboratory 170 miles away from the border for a more comprehensive examination.  *Cotterman*, 637 F.3d at 1070.  Not even the most generous reading of the phrase "at the border" includes a location so remote from the actual border.  The majority nevertheless found that "the border" may extend hundreds of miles into the interior of this country due to "reason and practicality."  *Id.* at 1076.  Because this analysis was untethered to the very place that justifies the

exception to the warrant requirement of the Fourth Amendment—the border—it is fundamentally flawed.

3. The majority concluded that it "furthers no constitutional purpose" to require "the Government to demonstrate a higher level of suspicion before it may transport property to conduct more thorough and efficient searches." *Id.* at 1078. But the majority failed to recognize that the Government's interest in protecting its borders (as opposed to enforcing the law domestically) becomes far more attenuated once a person or property leaves the border. *See Caicedo-Guarnizo*, 723 F.2d at 1423. It also failed entirely to connect its analysis concerning the *manner* of the search to precedent explaining that a suspicionless search may be deemed unreasonable because of the particularly offensive manner in which in which it was carried out.

In *Seljan*, this Court observed, "*Ramsey* suggested that a border search might be unreasonable 'because of the particularly offensive manner in which it is carried out,' citing as examples searches that were held unreasonable in *Kremen* v. *United States*, 353 U.S. 346 (1957) (officers, without a search warrant, seized the entire contents of a cabin and took the items 200 miles away to be examined) * * * ." 547 F.3d at 1002 (parallel citation omitted). Thus, the *en banc* Court, as well as the Supreme Court, has recognized that the seizure and transportation of property over hundreds of miles *is* constitutionally significant. It renders the search (and

16

seizure) unreasonable. *See id.* The majority's failure even to *acknowledge* the constitutional significance of the transportation of the laptop away from the border thus renders its decision contrary to binding precedent.

### III. REHEARING IS WARRANTED TO ENSURE THAT SEARCHES INVOLVING PERSONAL ELECTRONIC DEVICES AT THE BORDER ARE NOT CONDUCTED ARBITRARILY.

The panel majority's opinion is flawed in yet another way: It fails to impose any meaningful limits on the Government's authority to search the contents of personal information stored in computerized electronic devices, or to seize and transport personal property away from the border. Instead, the majority concluded that it would "continue to analyze the Government's conduct on a case-by-case basis to determine whether searches or seizures are effectuated in such a manner as to render them unreasonable." *Cotterman*, 637 F.3d at 1079. But this is exactly the type of *ad hoc*, amorphous approach to the border search doctrine that the Supreme Court rejected in *Flores-Montano*. *See* 541 U.S. at 152. Exceptions to the warrant requirement of the Fourth Amendment instead must be "narrow" and "well-delineated." *See Flippo*, 528 U.S. at 13; *Thompson*, 469 U.S. at 21. The majority's formulation of the border search exception is anything but.

As explained above, the invasion of privacy and dignity concerns that occurs when an electronic device such as a laptop or cell phone is searched demands a more meaningful and predictable degree of protection. Absent such protection, the

17

search and seizure of these unique items is bound to be arbitrary, is in danger of being based on impermissible considerations such as racial or religious profiling, and may even have a chilling effect on free speech. *See* Project Report 2, 6-7. In order to avoid these abuses, the Project submits that the Court should maintain the balance struck by the extended border search exception: it should require, at minimum, reasonable suspicion before a border agent may either search the contents of an electronic storage device or transport any type of personal property away from the border (or its functional equivalent) for further examination. Such a standard would both protect the individual's concerns of privacy and also would make searches at the border more effective tools for law enforcement by "focus[ing] limited law enforcement resources where they can be most effective. *See* Project Report 10. In addition, the Project respectfully submits that, if law enforcement wished to detain an electronic storage device for more than 24 hours, or copy data from that device, probable cause should be required. *Id.* at 9.

## CONCLUSION

For the foregoing reasons, the petition for rehearing en banc should be granted.

Respectfully submitted,

 /s/ Christopher T. Handman

SHARON BRADFORD FRANKLIN
The Constitution Project
1200 18th Street, N.W.
Suite 1000
Washington, D.C. 20036
(202) 580-6928
sfranklin@constitutionproject.org

CHRISTOPHER T. HANDMAN
MARY HELEN WIMBERLY
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5719
chris.handman@hoganlovells.com

Dated: September 22, 2011

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(a)(5), (a)(6), and (a)(7) of the Federal Rules of Appellate Procedure, as well as Circuit Rule 29-2(c)(2), I hereby certify that this brief was produced in Times New Roman 14-point typeface using Microsoft Word 2003 and contains 4,199 words.


 /s/ Christopher T. Handman
Christopher T. Handman

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September 2011, the foregoing Brief for Amicus Curiae was filed with the Court's ECF system, and accordingly was served electronically on all parties.


 /s/ Christopher T. Handman
Christopher T. Handman